**Gregory W. MARINO, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–5756.**

Court of Appeals of Alaska.

March 21, 1997.

---

Sharon Barr and Leslie A. Hiebert, Assistant Public Advocates, and Brant G. McGee, Public Advocate, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

MANNHEIMER, Judge.

Gregory W. Marino appeals his convictions for first-degree murder and attempted first-degree murder, as well as the 198–year composite sentence he received for these crimes. Marino questions various evidentiary rulings made by the trial court, and he asserts that his sentence is excessive. We affirm these convictions and sentence.

Marino also appeals his convictions for third- and fourth-degree misconduct involving a controlled substance. During the murder investigation, Marino voluntarily gave blood and urine specimens to the police after he was assured that these specimens would be used only in the murder investigation and not to prove that Marino had committed any drug offense. Despite this assurance, the State used test results from these specimens to prove that Marino had possessed cocaine, both for delivery and for personal use. We agree with Marino that the State should not

have been allowed to use the test results in this manner, and we therefore reverse Marino's drug convictions.

### Facts of the case

*The Assault.* A little after 11 o'clock on the night of October 22, 1993, seven-year-old Lien Chau Nguyen was awakened by screams. Lien Chau's cousin, Donna Jackson, was calling for help. Lien Chau left her bed and went into the living room to see what was happening. She saw an intruder attacking her cousin. When the man saw Lien Chau, he attacked her and began to choke her. With Donna Jackson's aid, Lien Chau escaped from her attacker and ran into her mother's bedroom. Finding no one there, Lien Chau went back to her own room and hid under the bed.[1]

From her place of hiding, Lien Chau heard the man come looking for her. The man first went into her mother's room, and then he came to Lien Chau's room. He shook the bed, then looked under it. When he saw Lien Chau, he pulled her out from beneath the bed.

The man demanded to know where Lien Chau's sister was; he promised not to hurt Lien Chau if she told him. Lien Chau replied that she did not know where her sister was. When Lien Chau gave this answer, the man stabbed her in the throat and, according to Lien Chau's testimony at trial, "tried to cut off [her] head". Lien Chau blocked her neck with her hands as the man continued to stab her. She then pretended she was dead. The man stopped stabbing her and left the apartment through the bedroom window.

When the attacker was gone, Lien Chau ventured back into the living room to see what had happened to her cousin. She saw Donna Jackson lying dead on the floor.

Lien Chau tried to get out of the apartment, but she could not turn the door knob: her hands were too slippery from her own blood. She went to the kitchen, washed her hands, and then she called the 911 emergency operator. The time of this call was 11:20 p.m..

Lien Chau told the 911 operator that a black man had beaten and killed her cousin Donna, that he had also stabbed Lien Chau, and that he had fled through Lien Chau's window. A paramedic who was listening on the line with the 911 operator asked Lien Chau who had stabbed her. She replied that the man was her sister's friend, and that he lived near Tommy's (a grocery and convenience store in Mountain View).

Shortly thereafter, the police and paramedics arrived at Lien Chau's house. They put a towel around Lien Chau's neck to staunch the bleeding, and then they took her to the hospital. The hospital examination revealed that Lien Chau had several knife wounds to her head and neck. One of these wounds was very serious: the knife had penetrated the back of her mouth, missing her carotid artery by only a few millimeters. Lien Chau also had a chest wound and numerous defensive wounds on her hands (from attempting to grab the knife blade).

When the police initially entered the apartment, they had to step over Donna Jackson's body, which lay just inside the door. The apartment had clearly been the scene of a struggle. Furniture was overturned throughout the apartment. Blood was spattered on the walls, and the floor around Jackson's body was soaked with blood. In Lien Chau's bedroom, there was blood on the curtain, the bed, the chest of drawers, and the window sill (the exit route used by the attacker).

In the living room, the police found two knives near Jackson's body. Both of these knives had blood and hair on them, and one of them was broken. The police also found an upright vacuum cleaner near Jackson's body. The vacuum cleaner was covered with blood, and the handle had been broken off from the base. The base of the vacuum was literally full of blood; it had to be drained and dried before the police could test it for fingerprints. There was a third bloody knife, a large bent one, on the floor of Lien Chau's bedroom near her window.

Subsequent medical examination revealed that there were approximately sixty-two

---

1. Lien Chau's mother, Karen Nguyen, had gone out.

knife wounds in Donna Jackson's body. Jackson had been stabbed in the heart, both lungs, the spleen, and the liver. Jackson had also sustained a serious head injury caused by a blunt object—most likely, the vacuum cleaner.

*Background.* Lien Chau Nguyen had a 17–year–old sister named Lien Thuong. Gregory Marino and Lien Thuong Nguyen had been involved in a romantic relationship for the four or five months preceding the homicide. Lien Thuong would purchase cocaine for the two of them. Two weeks before the homicide, Marino had given Lien Thuong five rings to use as collateral for a cocaine purchase. Lien Thuong used the rings to buy crack cocaine, which she and Marino smoked.

At about the same time as the ring-pawning incident, Lien Chau had occasion to spend the evening at Marino's apartment. The night was October 8th—Lien Chau's seventh birthday. Michelle Pungowiai (a cousin of Lien Thuong's) was babysitting Lien Chau while Lien Thuong spent time with Marino at Marino's apartment. Apparently, Pungowiai was unable to stay with Lien Chau for the whole evening, so she took Lien Chau to Marino's apartment and dropped her off there.

Lien Thuong and Marino gave Lien Chau some food and some candy, and then they left her to watch television while they went into the bedroom. Lien Chau watched television until she fell asleep. After a couple hours, Lien Chau's mother came to Marino's apartment and picked her up.

About a week later (that is, a week before the murder), Marino began to press Lien Thuong for the return of his rings. Marino threatened to hurt Lien Thuong if she did not get the rings back. He also threatened to hurt "somebody close to [her]".

Two days before the murder, Marino communicated a new threat to Lien Thuong through Michelle Pungowiai. Marino told Pungowiai to tell Lien Thuong that if she did not get him the money she owed him, he would harm Lien Thuong or someone else in her family.

On the day of the murder, Lien Thuong spoke to Marino on the telephone. Marino again asked her when she was going to redeem his rings from the cocaine dealer. During this conversation, Marino asked Lien Thuong if she knew of anyone who had money or jewelry. Lien Thuong named a drug dealer she knew. Marino said that he was going to the drug dealer's house to rob and kill him. Marino then offered Lien Thuong a description of what it felt like to kill someone. Marino told her that the act of killing was a "rush" like taking drugs. He told Lien Thuong that it was entertaining to watch someone begging for their life, and then he laughed.

On the night of the murder, Marino visited the Nguyens' apartment at around 8 o'clock. Lien Thuong opened her bedroom window and told Marino to be quiet: her sister (Lien Chau) and her cousin (Donna Jackson) were in the living room, and she did not want them to know that Marino was visiting. She then had Marino enter the apartment through her window. (The latch on this window had been broken for some time, and the Nguyens used it as a second entrance.)

Marino had brought crack cocaine with him; Lien Thuong, Pungowiai, and Marino smoked the crack. Lien Thuong then made a phone call to a drug dealer, who delivered some more cocaine to the apartment. Lien Thuong, Pungowiai, and Marino smoked that cocaine as well.

Marino left the apartment between 9:30 and 10:00 p.m.. Shortly after he left, Marino telephoned the apartment and spoke with Lien Thuong about getting more cocaine. Lien Thuong and Pungowiai left the apartment soon after Marino's telephone call. When they left, Donna Jackson and Lien Chau were watching television. Jackson had another hour to live.

*The Investigation.* When Lien Chau was brought to the hospital immediately following the assault, she spoke with Officer Bridges just before she underwent surgery. Lien Chau said that her attacker had been wearing a dark cloth jacket, rubber boots, and a black hat with a white "A" on it. Lien Chau also described her attacker as having curly hair and a mustache. She told the police

that this man lived in a peach-colored apartment building near Tommy's.

Based on Lien Chau's statements, police detectives located a peach-colored apartment building near Tommy's Grocery at 3701 Richmond Street. They set up surveillance of this building shortly before 2:00 a.m.. A few minutes later, the officers saw a black man walk into the apartment building. The officers spoke to the building manager and found out that there was only one person living in the apartment complex who matched Lien Chau's description. That man lived in apartment number 11.

The officers went to apartment 11 and knocked on the door. Marino answered. The officers identified themselves and asked Marino to accompany them to the police station. Marino agreed. One of the officers followed Marino to the bedroom to retrieve a jacket. This officer testified that he saw a dark hat with a white letter on the front of it lying on Marino's bed. The officer also noticed that Marino had a fresh cut on the little finger of his right hand and an apparent bloodstain on one of his thumb-nails.

The officers transported Marino to the police station, where they obtained his consent to search his apartment. The officers also questioned Marino concerning his whereabouts and activities that night. Marino repeatedly denied any involvement in the attack.

Marino told the police that he was friends with Lien Thuong Nguyen, and that he had visited the Nguyens' apartment earlier that night to take drugs with Lien Thuong. Marino said that he stayed at the apartment for 30 to 45 minutes, that he left between 10:00 and 10:30, and that he had not returned. Marino subsequently consented to have the police take his fingerprints, take blood and urine specimens, and take fingernail scrapings for forensic testing.

The police conducted a search of Marino's apartment on the morning of October 23rd.

They found no sharp knives, no rubber boots, and no black hat with the letter "A" on it.[2]

During their investigation of the crime scene, the police took several blood samples. None of these matched Marino's blood. The police also obtained several shoe prints from the crime scene. None of the shoe prints could definitely be attributed to Marino. The police also obtained seven usable fingerprints from the crime scene, as well as an adult's hand print in Lien Chau's bedroom and another hand print on the handle of the vacuum cleaner. None of these prints matched Marino's.

None of the items the police seized from Marino's apartment (various items of clothing, as well as a washcloth and a shoe-cleaning kit) had blood on them, with the exception of one jacket. DNA testing eliminated Donna Jackson and Lien Chau Nguyen as possible sources of the blood on the jacket.

There was no other forensic connection between Marino and the crime scene. There was no match between Marino's hair and hair samples found at the crime scene, nor were any hairs from Donna Jackson or Lien Chau Nguyen found at Marino's apartment or on any of his clothing. The police also tested for carpet fibers, but again there was nothing linking Marino to the crime scene.

On October 25th, the police interviewed Lien Chau again at the hospital. From a photograph of Marino's apartment building, Lien Chau identified the door to Marino's apartment as the place where her attacker lived. The police then showed Lien Chau a six-person photographic lineup. She picked Marino's photograph.

Based on Lien Chau's identification, and notwithstanding the lack of physical evidence to tie Marino to the homicide, a grand jury indicted Marino for first-degree murder for the killing of Donna Jackson. The grand jury also indicted Marino on alternative charges of attempted first-degree murder and first-degree assault for the attack on Lien Chau Nguyen. In addition, the grand

2. Even though the police did not find the rubber boots or the black cap with the letter "A" that Lien Chau had described, testimony at trial linked these items to Marino. Lien Thuong Nguyen testified that she had seen a cap in Marino's apartment like the one described by her sister. Lien Thuong also testified that Marino normally kept a pair of rubber boots in his apartment behind the door.

jury indicted Marino on two drug charges: third-degree misconduct involving controlled substances (possession of cocaine with intent to deliver), and fourth-degree misconduct involving controlled substances (simple possession of cocaine).

Following a jury trial in the Anchorage superior court, Marino was found guilty of all five charges. The State stipulated that, for sentencing purposes, the first-degree assault conviction was subsumed in the attempted murder conviction.

Superior Court Judge Mark C. Rowland sentenced Marino to 99 years' imprisonment for the murder of Donna Jackson, to a consecutive 99 years' imprisonment for the attempted murder of Lien Chau Nguyen, and to a consecutive 6 years for the drug convictions. Judge Rowland also declared that Marino was not eligible for parole.

### Marino's motion for disclosure of the juvenile records of certain witnesses

Before trial, Marino sought disclosure of all Division of Family and Youth Services records relating to Lien Thuong, Lien Chau, Karen Nguyen (their mother), and Michelle Pungowiai, as well as the records from any Child–in–Need–of–Aid proceedings involving the three juveniles (Lien Thuong, Lien Chau, and Michelle). Judge Rowland said that he would defer ruling on the merits of Marino's request until he had a chance to examine the documents *in camera*. The judge ordered the State to turn the records over to him for private inspection so that he could determine which documents (if any) should be disclosed to the defense. *See* Alaska Criminal Rule 16(d).

Within the week, the State turned over all of the records to the court. However, Judge Rowland never issued a subsequent order. That is, the judge never affirmatively granted or denied Marino's request for disclosure, nor did he issue any other order partially granting the request (by designating particular documents to be disclosed). The documents remained with the court and never were disclosed to the defense. Marino's attorney conducted the trial (and cross-exam-

ined the juveniles) without seeking a further ruling from the court.

■ On appeal, Marino argues that the trial judge should have disclosed these documents to the defense. However, Marino chose to proceed without seeking a ruling on the merits of his discovery motion. He therefore can not raise this issue on appeal. *See Erickson v. State*, 824 P.2d 725, 733 (Alaska App.1991) ("[I]n order to properly preserve this issue for appeal, it was [the defendant's] duty to insist that the trial court rule on his motion[.]"); *Jonas v. State*, 773 P.2d 960, 963 (Alaska App.1989) (by failing to seek a ruling on his motion for a psychiatric evaluation of the complaining witness, the defendant forfeited his right to argue on appeal that the trial court should have granted the motion).

### Marino's motion for suppression of Lien Chau's identification of him from the photographic lineup, and for suppression of her subsequent in-court identification

As described above, Lien Chau called the 911 emergency operator minutes after the murderer left her residence. Lien Chau told the operator that her sister's friend, a black man who lived near Tommy's Grocery, had killed her cousin and had stabbed her.

Approximately two and a half days later, on the afternoon of October 25, 1993, Anchorage Police Detective Bill Reeder interviewed Lien Chau at the hospital. (Until this time, Lien Chau had been heavily sedated and thus unavailable to be interviewed.) Lien Chau's nurse and Lien Chau's mother were also in the hospital room during the interview.

Reeder spoke to Lien Chau about her previous statement to the 911 operator (that her assailant lived near Tommy's). He asked Lien Chau if she knew what color her assailant's apartment building was; she again identified it as peach-colored.

Reeder then showed Lien Chau a photograph of Marino's apartment building; Lien Chau told the officer that she recognized the building. Reeder asked Lien Chau to point out the apartment of the person who had attacked her. (This apartment building is

constructed like a motel; the entrances to the individual apartments are on the outer walls of the building.) Lien Chau pointed to the entrance to Marino's apartment.

When Lien Chau pointed out Marino's apartment, her mother and her nurse clapped. Reeder himself commented that Lien Chau had "pointed . . . right to the defendant's door". Reeder then showed Lien Chau an array of six photographs. He told her only that these were "photographs of . . . some black men", and he cautioned her that the inclusion of particular people in the array "[didn't] mean [that] these people are bad people". Reeder added, "I don't know if this man['s] picture is there or not, and I need you to tell me whether you . . . can recognize a picture, okay?" Lien Chau told Reeder that the man depicted in photograph number 3 "looks like it might be him . . . 'cause he had hair like this one. . . . I think that's him, 'cause he had [a] lot [of] curly hair here."

Marino's photograph was in position number 3. Lien Chau's reference to "curly hair" is puzzling, since Marino's photograph clearly shows him to be nearly bald. However, whatever Lien Chau meant by her reference to curly hair, there is no doubt that she selected photograph number 3, and this was Marino's photograph.

Marino asked Judge Rowland to suppress Lien Chau's identification of his photograph from the array. Marino argued that the identification procedure had been unduly suggestive. Marino also asked the judge to prohibit Lien Chau from identifying him in court, arguing that any in-court identification would be the product of the tainted photographic identification.

Judge Rowland denied these motions. The judge stated that he thought certain aspects of the identification procedure were improperly suggestive (the applause when Lien Chau identified Marino's apartment, and Reeder's simultaneous statement that Lien Chau had pointed to "the defendant's" door). Nevertheless, Judge Rowland concluded that the procedure as a whole was unlikely to yield an unreliable identification. He noted that Lien Chau had had a good opportunity to observe her assailant, she had

previously given a description of her assailant to the 911 operator, and she had expressed a high level of certainty when she identified Marino's photograph.

On appeal, Marino renews his contention that the photographic identification was impermissibly suggestive, and that Lien Chau's subsequent in-court identification of Marino should have been suppressed as the tainted fruit of the photographic identification.

Marino first argues that, although each of the six photographs depicts a black man, the skin tone of the other five men is significantly lighter than Marino's skin tone. Judge Rowland found this assertion to be baseless. We have examined the photographic array, and we agree with Judge Rowland.

██ Marino then points out that the man depicted in photograph number 5 is looking up and to his left, as if directing his gaze at Marino in photograph number 3. (The photographs are arranged in two rows of three, numbered left to right.) Marino asserts that this man's eyes inexorably draw a person's attention to photograph 3, thus implicitly suggesting that the man in photograph 3 should be identified as the culprit. Judge Rowland found this assertion to be "frivolous", and again we agree.

██ This brings us to the question raised about the reactions displayed by Reeder and the bystanders when Lien Chau identified Marino's apartment (the applause and Reeder's statement that Lien Chau had identified "the defendant's" apartment). Marino asserts that these reactions tainted Lien Chau's later selection of Marino's photo from the six-person photographic lineup. While such reactions might potentially be problematic in other circumstances, we are convinced that they are essentially irrelevant in Marino's case.

Marino was not a stranger to Lien Chau; she knew who he was. On October 8, 1993 (two weeks before the attack), Lien Chau spent the evening at Marino's apartment. Marino gave Lien Chau food and candy.

When Lien Chau spoke to the 911 operator just minutes after her assailant fled, she obviously had a particular person in mind.

She identified her attacker as a person she knew: the black man who was her sister's friend and who lived near Tommy's. After Lien Chau identified Marino's apartment as the place where her attacker lived, it was clear that Lien Chau believed Marino was the person who had attacked her and Donna Jackson. Marino was the identifiable suspect even if the police had never shown the photographic lineup to Lien Chau.

When Lien Chau subsequently picked Marino's photograph from the six-person array, she merely confirmed her previous identification. Had Lien Chau picked someone else, this might have been significant; but she in fact picked out Marino, the person who lived in the apartment that she had already identified.

Under these circumstances, even if there was potential suggestiveness in the way the photographic lineup was presented to Lien Chau, this potential suggestiveness had very little significance. From the outset, Lien Chau had identified her assailant as her sister's friend. By the time she was shown the photographic lineup, Lien Chau had identified the building and the apartment where that friend lived. In light of this, the photographic lineup simply tested Lien Chien's ability to identify a photo of that friend.

One could argue (and Marino did argue at trial) that Lien Chau was mistaken when she identified her sister's friend as her attacker. But if Lien Chau indeed mistook someone else for Marino, she made this mistake at the time of the crime, not when the police showed her the photographic lineup at the hospital.

For these reasons, we uphold Judge Rowland's denial of Marino's motion to suppress the photographic identification, and we also uphold Judge Rowland's denial of Marino's motion to prohibit Lien Chau from identifying him in court.

*Marino's motion for mistrial based on Lien Thuong's testimony that Marino had said he got a "rush" from killing people*

At trial, Lien Thuong testified that Marino had telephoned her on the day of the murder and had suggested that he was going to murder a drug dealer to obtain money and jewelry. The prosecutor then asked Lien Thuong, "Did Gregory Marino tell you how it ... might feel to kill someone?" Lien Thuong answered:

He told me [that] the feeling, the rush of killing somebody, there's no other rush like it, as when you're doing drugs or whatever. There's nothing else like that rush.... He said [that] the thought of a person begging for their life [was] funny, and he started to laugh.

Lien Thuong later testified that she was unsure exactly when Marino had said this to her; she conceded that it might have been a few days before the murder.

Marino sought a mistrial because of the above-quoted testimony. Marino's attorney argued that it was unclear from Lien Thuong's testimony exactly when these remarks were made, and thus the remarks did not necessarily reveal Marino's state of mind at the time of the murder. Moreover, the defense attorney argued that the jurors might infer from these comments that Marino had committed other unspecified murders, thus prejudicing their consideration of the charges before them.

Judge Rowland denied Marino's motion for mistrial. He concluded that Lien Thuong's evidence was relevant to Marino's state of mind at the time of the murder. While Judge Rowland acknowledged that there was conflicting evidence as to the date on which Marino made these remarks, the judge concluded that "the trier of fact could certainly find that [Marino made these] remarks ... on the day of the homicide", and thus the remarks were probative of Marino's state of mind and intent.

Judge Rowland also concluded that Marino's remarks were relevant because they "form[ed] part of the fabric of threats and intimidation" that Marino had engaged in prior to the homicide, as he attempted to induce Lien Thuong to retrieve the rings that had been pledged to drug dealers. Marino's threats, Judge Rowland found, were probative of his "continuing obsession with the return of these rings, which he deemed to be his property".

Responding to Marino's suggestion that the remarks might be interpreted as indicating that Marino had killed people before, Judge Rowland offered to give a clarifying or limiting instruction. Marino's attorney told the judge that she would submit one, but she never did.

■ On appeal, Marino renews his claim that Lien Thuong's testimony required a mistrial. However, we agree with Judge Rowland that the testimony concerning Marino's remarks was admissible.

Because Marino's statements tended to prove that he was in a murderous state of mind, these statements were admissible if they were made near the time of the homicide. See Lerchenstein v. State, 697 P.2d 312, 314–19 (Alaska App.1985), affirmed, 726 P.2d 546 (Alaska 1986). Judge Rowland found that, even though the evidence was conflicting, a reasonable fact-finder could conclude that Marino made these statements on the day of the homicide. He therefore did not abuse his discretion in admitting the evidence. See Alaska Evidence Rule 104(b), dealing with situations in which the relevance of certain evidence depends on a foundational finding of fact.

Moreover, the record supports Judge Rowland's alternative finding—that Marino's statements reveal that he was fixated on obtaining the return of the rings that had been pledged to the drug dealers, and that Marino was trying to "encourage" Lien Thuong to retrieve the rings by using threats and intimidation, hoping that veiled threats of murder would frighten her into action.

It is noteworthy that, although the first ground of relevance (state of mind) rests on a finding that Marino was truthfully stating his current emotions and intentions, this second ground of relevance (the use of threats as a way to scare Lien Thuong into action) did not require a finding that Marino was telling the truth when he declared that he got a thrill from killing. If the remarks are viewed as

threats, they are relevant not because of how Marino might have felt about killing, but because they showed that Marino wanted Lien Thuong to believe that he got a thrill from killing.

It is also important to note that, under either of these two theories of relevance, Marino's remarks are probative regardless of whether he had ever killed another person. That is, the relevance of the remarks does not lie in what they might reveal about Marino's past activities. Rather, their relevance lies in what they reveal about Marino's intentions and motivations at the time he uttered those remarks. This distinction might have been emphasized to the jury in a limiting instruction, but the distinction is reasonably apparent simply from the evidentiary context in which Marino's remarks were admitted. Moreover, as noted above, Marino declined Judge Rowland's explicit invitation to submit a limiting instruction.

For these reasons, we uphold Judge Rowland's denial of Marino's motion for a mistrial.

### Marino's motion for judgement of acquittal

■ Marino asserts that there is insufficient evidence to support his conviction for murder and attempted murder. However, Marino's argument is based on his assertion that Lien Chau should not have been permitted to identify him as the man who assaulted her and killed Donna Jackson. We have just upheld the admissibility of this evidence. Lien Chau's identification of Marino provides sufficient evidentiary support for his murder and attempted murder convictions.[3]

### Marino's declarations of innocence to the police

As indicated above, the police interviewed Marino for approximately two hours on the morning following the homicide. During this interview, Marino repeatedly declared that

---

3. We note that, even if the photographic lineup and in-court identification evidence should have been suppressed, Marino would still not be entitled to a judgement of acquittal. See Houston–Hult v. State, 843 P.2d 1262, 1265 n. 2 (Alaska App.1992) (a defendant who contends on appeal that the trial judge should have excluded a portion of the State's evidence can not then argue that the State's remaining evidence was insufficient to withstand a motion for judgement of acquittal).

he was innocent. He readily consented to police requests to search his apartment and his belongings, as well as to provide body specimens for forensic testing.

This interview was videotaped. At trial, the defense attorney asked Judge Rowland for permission to play the entire videotaped interview to the jury—or, in the alternative, for permission to play an abridged version of the interview that still contained several of Marino's assertions of innocence.

■ A defendant's out-of-court assertions of innocence are hearsay if they are offered by the defendant to prove the truth of the matter asserted (the defendant's innocence). *See State v. Agoney,* 608 P.2d 762, 764 (Alaska 1980); *Stumpf v. State,* 749 P.2d 880, 899 (Alaska App.1988). The defense attorney argued, however, that Marino's statements to the police fell within the hearsay exception for "excited utterances", Alaska Evidence Rule 803(2). The exciting event that triggered Marino's statements, according to the defense attorney, was the police officers' accusation that Marino was guilty of murder.

■ To obtain admission of a hearsay statement under the "excited utterance" exception, the proponent of the evidence must show that the statement was uttered under the stress or excitement of a startling event or condition that "temporarily still[ed] the [speaker's] capacity [for] reflection and ... conscious fabrication". *See* Commentary to Evidence Rules 803(1)-(2), third paragraph. Judge Rowland found that, under the facts of this case, Marino's statements were not "excited utterances".

■ Marino challenges this finding on appeal. He argues that being falsely accused of murder is an exciting circumstance likely to exert a lengthy influence on a person's emotions. However, the question is not whether Marino was under stress during the police interview; instead, the question is whether Marino proved that his statements were not the product of conscious reflection:

> The fact that [a person] may have been under stress is not sufficient, by itself, to establish the admissibility of [their] hearsay statements under Evidence Rule 803(2). The question is whether [the per-

son's] out-of-court statements were the product of [their] conscious reflection about what [they] should say.

*Ryan v. State,* 899 P.2d 1371, 1378 n. 4 (Alaska App.1995).

Based on the facts of this case, Judge Rowland could reasonably conclude that, guilty or innocent, Marino understood that the police suspected him of murder, and he had both the time and the presence of mind to prepare his replies to their questions. Judge Rowland's finding is not clearly erroneous, and therefore we uphold his ruling that Marino's statements were not "excited utterances".

■ Marino argues alternatively that his statements to the police should have been admitted because they demonstrate his state of mind—more specifically, because "they demonstrate an innocent state of mind". Evidence Rule 803(3) creates a hearsay exception for statements describing the speaker's then-existing state of mind or emotion. However, Rule 803(3) explicitly declares that this hearsay exception does not authorize introduction of "statement[s] of memory or belief to prove the fact remembered or believed". The second paragraph of the commentary to Rule 803(3) explains:

> The exclusion of "statements of memory or belief to prove [the] fact remembered or believed" is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing [proof of a person's] state of mind ... to serve as the basis for [inferring] the happening of the event which produced the state of mind.

In other words, Rule 803(3) does not allow hearsay testimony about a person's belief when that testimony is being offered to prove that the belief was accurate or true. More specifically, Rule 803(3) would not authorize Marino to introduce hearsay testimony that he asserted his innocence if the only relevance of this testimony was to suggest (1) that Marino was being honest when he asserted that he believed himself innocent of the crimes, and (2) that Marino would not believe himself to be innocent unless he was in fact innocent.

Some cases from other jurisdictions suggest that, just as evidence of a defendant's conduct can be introduced to prove consciousness of guilt, so too evidence of the defendant's conduct (for instance, cooperation with the police) might be admissible to prove "consciousness of innocence". See the discussion of this point in *Lewis v. State,* 469 P.2d 689, 691 (Alaska 1970). This proposition is premised on the recognition that non-assertive conduct is not a "statement" under Evidence Rule 801(c); that is, evidence of a person's conduct is not barred by the hearsay rule so long as the conduct was not intended as an assertion.

When Marino argued for admission of his videotaped interview with the police, his goal was to get his words—his assertions of innocence—in front of the jury. This is not the non-assertive conduct evidence that *Lewis* discusses. Marino was not entitled to introduce his assertions of innocence by labeling them verbal conduct.

Judge Rowland understood this distinction between assertions (both verbal and nonverbal) and non-assertive conduct, because he allowed Marino to play limited portions of the videotape: those portions in which Marino expressed his desire to cooperate with the police and in which Marino consented to be fingerprinted, to have the police search his residence, and to have the police take samples of his blood and urine. Judge Rowland explained his ruling this way:

> We have a murder scene ... that, by all accounts, [was] horrendous[,] bloody, [and] brutal.... [W]hoever [was] present [there], ... it would have been a horrendous experience. Because of that, [the defendant's] interview [with the police] has evidentiary value above and beyond the questions asked and answered. It is a visual [record] of this defendant within hours after this incident. His demeanor within hours after an incident of this kind seems to me to have evidentiary significance in and of itself. How he behaved [at that time is] something that reasonably could be considered by the trier of fact, independent of the questions asked and answered.

The State argues that it was error for Judge Rowland to admit even these limited portions of the videotape, but we need not decide that issue. The record shows that Marino obtained the most favorable ruling he could reasonably hope for under existing evidence law. We find no error.

Having decided all of Marino's challenges to his murder and attempted murder convictions, we affirm his convictions for these crimes. We now turn to Marino's attack on his convictions for third- and fourth-degree misconduct involving a controlled substance.

### Marino's motion for limited suppression of his blood and urine test results

During Marino's interview with the police, the officers asked Marino for permission to take blood and urine specimens from him, and Marino agreed. However, after Marino was indicted for possession of cocaine based on the laboratory analysis of these specimens, Marino asked the superior court to prohibit the State from using these test results as evidence of drug offenses. He argued that the police had tricked him into consenting to give the body specimens by assuring him that the specimens would not be used as evidence of drug offenses. Judge Rowland denied Marino's motion. Based on our review of the record, we conclude that Marino's suppression motion should have been granted.

When Detective Baker asked Marino to give the police blood and urine specimens, he told Marino:

> Believe me, ... neither this lieutenant nor I give a fuck whether you [are] high or not at the moment, you know what I mean? That's not why we're here, okay? We're here for serious stuff[.]

Later, Baker told Marino:

> Once again, [we are asking for these specimens] to help remove you from the picture [as a murder suspect].... I want you to understand that we are not interested in any kind of drug offenses here[.] But we're going to take blood samples from [the murder scene, and then] compare [those samples] to yours, and make sure that yours doesn't match any of those.

At this point, Marino told Baker, "Let's do it."

The record shows that Marino gave his consent after the police promised him that his blood and urine specimens would be used for a particular purpose (tested against the samples found at the scene of the homicide) and would not be used for another particular purpose (tested to see if Marino was using illegal drugs). When the State later used the test results to establish that Marino was guilty of drug offenses, the State exceeded the scope of Marino's consent. The superior court should have barred the State from introducing the test results for this purpose.

The State argues that a ruling in Marino's favor on this issue amounts to a declaration that a criminal defendant may rely on a police officer's informal promise of immunity. The State points out that police officers, acting on their own, have no authority to grant immunity or make binding promises of nonprosecution. *Green v. State*, 857 P.2d 1197, 1201 (Alaska App.1993). However, the State's argument misses the point. The police asked Marino to waive his Fourth Amendment rights and voluntarily give them body samples. He was free to refuse and demand that the police obtain a warrant, but the police convinced him to consent by promising that the samples would not be used to establish his guilt of drug offenses. This was not a promise of immunity; rather, it was a statement that the police were seeking only a limited waiver of Marino's Fourth Amendment rights. *See State v. Binner*, 131 Or. App. 677, 886 P.2d 1056 (1994) (holding that, under the Oregon constitution, when a person consents to have their blood drawn and tested for specified substances, the scope of that consent limits the scope of the State's power to test the blood without a warrant).

The State further points out that, having given verbal assent to the blood and urine sampling, Marino then signed a written consent form which did not include any limitation on the use of the samples. In fact, the form specifically stated that the samples could be tested for evidence of "drug abuse". However, given Detective Baker's assur-ances, it would be unconscionable to hold Marino to the "fine print" on the consent form.

Finally, the State argues that any error in admitting the test results was harmless, because both Michelle Pungowiai and Lien Thuong Nguyen testified that Marino brought them cocaine and smoked it with them. However, the State presented no independent laboratory analysis of the substance that Marino delivered to Pungowiai and Lien Thuong Nguyen. The State's identification of that substance as cocaine was based on the fact that, several hours later, laboratory tests of the challenged blood and urine specimens revealed that Marino had cocaine in his system. Thus, the laboratory analysis of Marino's blood and urine was central to the State's case on the two drug charges.

We therefore conclude that the superior court should have prohibited the State from introducing the blood and urine test results as evidence of drug offenses, and we further conclude that the error in admitting these test results was not harmless. Marino is entitled to reversal of his convictions for third- and fourth-degree misconduct involving a controlled substance.[4]

### *Marino's sentence appeal*

Both first-degree murder and attempted first-degree murder are unclassified felonies. AS 11.41.100(b); AS 11.31.100(d)(1). The sentencing range for first-degree murder is 20 to 99 years, while the range for attempted murder is 5 to 99 years. AS 12.55.125(a) and (b).

Judge Rowland sentenced Marino to the maximum sentence (99 years) for each of these crimes, and he ordered the two sentences to run consecutively, for a total of 198 years' imprisonment. Further, Judge Rowland ordered that Marino not be eligible for parole during this sentence. *See* AS 12.55.115. On appeal, Marino challenges Judge Rowland's decision to run the two sentences consecutively, and his further deci-

---

4. Marino argues only that his drug convictions should be reversed on this ground.

sion to eliminate Marino's eligibility for parole.

Before a judge imposes a composite sentence that exceeds the maximum sentence for the defendant's most serious offense, Alaska law requires the judge to affirmatively find that such a sentence is necessary to protect the public. *Mutschler v. State*, 560 P.2d 377, 381 (Alaska 1977); *George v. State*, 836 P.2d 960, 963–64 (Alaska App.1992). Similarly, "[w]hen a sentencing judge restricts parole eligibility, the judge must specifically address the issue of parole restriction, setting forth with particularity his or her reasons for concluding that the parole eligibility prescribed by AS 33.16.090 and AS 33.16.100(c)-(d) is insufficient to protect the public and insure the defendant's reformation." *Stern v. State*, 827 P.2d 442, 450 (Alaska App.1992). Judge Rowland made such findings in this case.

In sentencing Marino, Judge Rowland gave the following description of Marino's crimes:

> Apparently angry at the failure of a seventeen-year-old girl (with whom he shared cocaine and sex) to recover certain property of his which had been pawned for the purpose of securing drugs, [the defendant] threatened to hurt this girl or someone close to her if she did not meet his demands.... Carrying out this threat, [the defendant] proceeded to the girl's home, but she was not there. The seven-year-old victim [Lien Chau Nguyen] was there, and her cousin [Donna Jackson], the decedent. The defendant attacked [Jackson] with a knife, perhaps more than one [knife], ultimately stabbing her over sixty times[.] [Then], without any apparent pity, [he] stalked and hunted down a seven-year-old girl, dragging her from her ... refuge under the bed, stabbing and cutting her until she had the presence of mind, even in the midst of such carnage—[and] carnage is certainly the word which describes it—to play dead.

Judge Rowland then explained his analysis of why a lengthy sentence was required:

> The facts and circumstances of the [defendant's] crimes ... are so wicked and savage, and [they] say so much about the defendant, that they overshadow all other information about the defendant which is available to the court.... [A] sentencing judge ... always tries, insofar as [is] possible, to understand ... the human motivation that was involved [in a defendant's crime]. I cannot in this case. The one word which kept returning to my mind [to] best describe the [defendant's] conduct is "savagery"[.] ... As I thought about the defendant's state of mind, I recalled a phrase [from the law of] the 18th and 19th century ... describing murderous intent, and that phrase was "a wanton and malignant heart". [W]hen I was a law student, I thought that it was an obscure and archaic phrase[,] ... [but] the facts of this case, and the defendant's conduct, underscore its vitality[.] The deliberate cruelty with which the defendant attacked these relatively defenseless victims, [the fact] that he could sustain the level of violence and cruelty that he did throughout, and the pedestrian and trivial purposes which apparently incited [his actions], demonstrate the defendant's capacity for evil. There are people who believe that there is a personification of evil, a beast that walks the earth. If there is, Mr. Marino, [then] that beast was in that house that day, and you were its agent.

Because Marino was a mature adult (43 years old at the time of sentencing), Judge Rowland concluded that Marino's patterns of behavior were "well-established" and the possibility of his rehabilitation was "nil". Based on Marino's conduct, Judge Rowland found that Marino was "certainly amongst the worst class of offender [and] amongst the most dangerous of men". The judge concluded:

> In my judgement, by his acts the defendant has lost the right to walk free in this or any other society again.... Society should not be required to take any risk at all for the benefit of this defendant['s] liberty.... [It is] my purpose ... in formulating [the defendant's] sentence [to ensure] that society does not have to take such a risk. [This] is, indeed, my sole purpose in fashioning a sentence in this case.... Only isolation will serve as a

deterrent [to this defendant].... I think it highly likely that, if the defendant were to be released, he would reoffend, and I think that he would not be deterred ... by any sentence to be imposed.

Judge Rowland then sentenced Marino to consecutive 99–year sentences, without eligibility for parole.

As can be seen from the above-quoted sentencing remarks, Judge Rowland explicitly concluded that Marino was an extremely dangerous man who would pose a serious threat to society if he were ever released from prison; the declared purpose of the sentence was to ensure that Marino never would be released. The record supports Judge Rowland's characterization of the offense and of the defendant. Because Lien Thuong Nguyen had not redeemed his rings from the drug dealers, Marino viciously attacked two people who were close to her (her cousin and her younger sister). Marino barely knew these victims; they had done nothing to him. They were simply instruments through which Marino could express his anger over a trivial matter. Showing utter contempt for his victims' lives, he killed one and left the other for dead.

Having independently reviewed the record, we conclude that Marino's sentence is not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

*Conclusion*

We AFFIRM Marino's convictions for murder and attempted murder, and the composite sentence he received for these crimes. We REVERSE Marino's convictions for delivering and possessing cocaine.