NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

GREGORY W. MARINO,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-13337
Trial Court No. 3AN-09-06684 CI

O P I N I O N

No. 2814 — August 22, 2025

Appeal from the Superior Court, Third Judicial District, Anchorage, Daniel Schally, Judge.

Appearances: Bradly A. Carlson, The Law Office of Bradly A. Carlson LLC, under contract with the Public Defender Agency (initial briefs), Emily Jura, Assistant Public Defender (supplemental brief), and Terrence Haas, Public Defender, Anchorage, for the Appellant. Diane L. Wendlandt, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge ALLARD.

In 1994, Gregory W. Marino was convicted, following a jury trial, of the first-degree murder of Donna Jackson and the attempted murder of seven-year-old Lien

Chau Nguyen.[1] In the years since, Marino has continued to maintain his innocence of these crimes.

In 2009, Marino filed an untimely application for post-conviction relief seeking further DNA testing of the evidence in his case. The DNA testing led to the identification of male DNA on one of the apparent murder weapons. Marino was excluded as a source of that male DNA, just as he had been excluded as a source of other DNA evidence tested in this case. Marino then amended his application, alleging that the new DNA test results, combined with a new eyewitness identification expert report, established his innocence by clear and convincing evidence.

An evidentiary hearing was scheduled at which Marino, his DNA experts, and his eyewitness expert were expected to testify. However, five days before the scheduled evidentiary hearing, the superior court dismissed Marino's application on summary disposition, concluding that there were no genuine issues of material fact and that the State was entitled to judgment as a matter of law. Marino now appeals that dismissal.

Because we agree with Marino that the superior court erred in dismissing this case on summary disposition, we vacate the superior court's order and remand this case to the superior court for further proceedings consistent with the guidance provided herein.

*Factual background*

To fully explain why Marino's post-conviction relief application should have proceeded to an evidentiary hearing, we must first explain in some detail the evidence presented at his trial.

---

[1] AS 11.41.100(a)(1)(A) and AS 11.41.100(a)(1)(A) & AS 11.31.100(a), respectively.

In 1994, Marino was convicted of the first-degree murder of Donna Jackson and the attempted murder of seven-year-old Lien Chau Nguyen. At the time of the attack, in October 1993, Karen Nguyen lived in an apartment with her two daughters — seven-year-old Lien Chau Nguyen and seventeen-year-old Lien Thuong Nguyen. Two of Karen's cousins — Jackson and Michelle Pungowiai — also stayed at the apartment on occasion. Relevant to the later post-conviction DNA testing that occurred in this case, only females were identified as living in the apartment.

This Court affirmed Marino's convictions on direct appeal[2] and the underlying facts as described in that opinion are provided below:

> A little after 11 o'clock on the night of October 22, 1993, seven-year-old Lien Chau Nguyen was awakened by screams. Lien Chau's cousin, Donna Jackson, was calling for help. Lien Chau left her bed and went into the living room to see what was happening. She saw an intruder attacking her cousin. When the man saw Lien Chau, he attacked her and began to choke her. With Jackson's aid, Lien Chau escaped from her attacker and ran into her mother's bedroom. Finding no one there, Lien Chau went back to her own room and hid under the bed.
>
> From her place of hiding, Lien Chau heard the man come looking for her. The man first went into her mother's room, and then he came to Lien Chau's room. He shook the bed, then looked under it. When he saw Lien Chau, he pulled her out from beneath the bed.
>
> The man demanded to know where Lien Chau's sister was; he promised not to hurt Lien Chau if she told him. Lien Chau replied that she did not know where her sister was. When Lien Chau gave this answer, the man stabbed her in the throat and, according to Lien Chau's testimony at trial, "tried to cut off [her] head". Lien Chau blocked her neck with her hands as the man continued to stab her. She then pretended she was dead. The man stopped stabbing her and left the apartment through the bedroom window.

---

[2] *Marino v. State*, 934 P.2d 1321, 1323 (Alaska App. 1997).

When the attacker was gone, Lien Chau ventured back into the living room to see what had happened to her cousin. She saw Donna Jackson lying dead on the floor.

Lien Chau tried to get out of the apartment, but she could not turn the door knob: her hands were too slippery from her own blood. She went to the kitchen, washed her hands, and then she called the 911 emergency operator. The time of this call was 11:20 p.m.

Lien Chau told the 911 operator that a black man had beaten and killed her cousin Donna, that he had also stabbed Lien Chau, and that he had fled through Lien Chau's window. A paramedic who was listening on the line with the 911 operator asked Lien Chau who had stabbed her. She replied that the man was her sister's friend, and that he lived near Tommy's (a grocery and convenience store in Mountain View).

Shortly thereafter, the police and paramedics arrived at Lien Chau's house. They put a towel around Lien Chau's neck to staunch the bleeding, and then they took her to the hospital. The hospital examination revealed that Lien Chau had several knife wounds to her head and neck. One of these wounds was very serious: the knife had penetrated the back of her mouth, missing her carotid artery by only a few millimeters. Lien Chau also had a chest wound and numerous defensive wounds on her hands (from attempting to grab the knife blade).

When the police initially entered the apartment, they had to step over Donna Jackson's body, which lay just inside the door. The apartment had clearly been the scene of a struggle. Furniture was overturned throughout the apartment. Blood was spattered on the walls, and the floor around Jackson's body was soaked with blood. In Lien Chau's bedroom, there was blood on the curtain, the bed, the chest of drawers, and the window sill (the exit route used by the attacker).

In the living room, the police found two knives near Jackson's body. Both of these knives had blood and hair on them, and one of them was broken. The police also found an upright vacuum cleaner near Jackson's body. The vacuum cleaner was covered with blood, and the handle had been

broken off from the base. The base of the vacuum was literally full of blood; it had to be drained and dried before the police could test it for fingerprints. There was a third bloody knife, a large bent one, on the floor of Lien Chau's bedroom near her window.

Subsequent medical examination revealed that there were approximately sixty-two knife wounds in Donna Jackson's body. Jackson had been stabbed in the heart, both lungs, the spleen, and the liver. Jackson had also sustained a serious head injury caused by a blunt object—most likely, the vacuum cleaner.[3]

At the time of the attack, Lien Thuong had been in a romantic relationship for four or five months with Marino, who is Black and lived near Tommy's. Lien Chau apparently did not know Marino well but had visited his apartment approximately two weeks before the attack. On that occasion, Lien Thuong, who was at Marino's apartment with him, agreed to have Lien Chau dropped off since nobody could babysit her. Lien Thuong and Marino sat Lien Chau in front of the television with food and candy to snack on while they stayed in the bedroom with the door closed. Lien Chau stayed for a couple of hours, eventually falling asleep before being picked up by her mother.[4]

In addition to being in a relationship, Marino and Lien Thuong also smoked crack cocaine together. Approximately two weeks before the attack, Marino gave Lien Thuong five gold rings to use as collateral for purchasing cocaine until he got paid. At trial, the State introduced evidence that Marino had threatened Lien Thuong and her family if the rings were not returned. As we stated in the direct appeal:

---

[3]   *Id.* at 1324-25.

[4]   According to Marino's second amended application for post-conviction relief, Lien Chau had only met Marino on this one occasion. Based on the trial testimony, the application asserted that Lien Chau "spent nearly the entire time she was at Marino's apartment alone, watching television, and eventually falling asleep, while her sister and Marino were in another room with the door closed."

About a week later (that is, a week before the murder), Marino began to press Lien Thuong for the return of his rings. Marino threatened to hurt Lien Thuong if she did not get the rings back. He also threatened to hurt "somebody close to [her]."

Two days before the murder, Marino communicated a new threat to Lien Thuong through Michelle Pungowiai. Marino told Pungowiai to tell Lien Thuong that if she did not get him the money she owed him, he would harm Lien Thuong or someone else in her family.

On the day of the murder, Lien Thuong spoke to Marino on the telephone. Marino again asked her when she was going to redeem his rings from the cocaine dealer. During this conversation, Marino asked Lien Thuong if she knew of anyone who had money or jewelry. Lien Thuong named a drug dealer she knew. Marino said that he was going to the drug dealer's house to rob and kill him. Marino then offered Lien Thuong a description of what it felt like to kill someone. Marino told her that the act of killing was a "rush" like taking drugs. He told Lien Thuong that it was entertaining to watch someone begging for their life, and then he laughed.[5]

Lien Thuong testified to these threats at trial, although she also testified that she did not take them seriously and that it was normal for them to joke about hurting and killing people. Marino's landlord likewise testified that Marino had threatened Lien Thuong, but that she (the landlord) did not take his threats seriously.

According to Lien Thuong, Marino came over to her apartment to smoke crack cocaine on the night of the murder:

On the night of the murder, Marino visited the Nguyens' apartment at around 8 o'clock. Lien Thuong opened her bedroom window and told Marino to be quiet: her sister (Lien Chau) and her cousin (Donna Jackson) were in the living room, and she did not want them to know that Marino was visiting. She then had Marino enter the apartment through her window. (The latch on this window had been

---

5   *Marino*, 934 P.2d at 1325.

broken for some time, and the Nguyens used it as a second entrance.)

Marino had brought crack cocaine with him; Lien Thuong, Pungowiai, and Marino smoked the crack. Lien Thuong then made a phone call to a drug dealer, who delivered some more cocaine to the apartment. Lien Thuong, Pungowiai, and Marino smoked that cocaine as well.[6]

Marino left the apartment sometime around 9:30 p.m. Lien Thuong and Pungowiai testified that Marino was wearing a gray-hooded black varsity jacket, a baseball cap, jeans, and black laced-up boots. Shortly after leaving, Marino called Lien Thuong to discuss getting more cocaine. Lien Thuong and Pungowiai then left the apartment sometime between 9:45 p.m. and 10:15 p.m. with a friend, and they did not see or speak to Marino again that night.

The attack took place around 11:00 p.m. At the hospital shortly after the attack, Lien Chau told police that the Black man who attacked her was wearing a black cloth jacket, blue jeans, rubber boots, and a black hat with a white letter "A" on it. Lien Chau also told police that the attacker lived in peach-colored apartments by Tommy's in Mountain View.

Lucy Captain, a friend of Marino's, testified that she called Marino at home at around 1:30 a.m. to see if he could get cocaine for her. Marino agreed; he went to Captain's house, picked up the money, left for ten to fifteen minutes, and returned with the cocaine. The two smoked the cocaine and Marino left. Captain testified that when she saw Marino, he appeared calm and did not have any blood or scratches on him. She also testified that he was wearing a gray-hooded varsity jacket that matched

---

6    *Id.*

Lien Thuong's and Pungowiai's descriptions of the jacket that they saw him wearing earlier that night.[7]

Shortly before 2:00 a.m., police staked out a peach-colored apartment building near Tommy's and, around 2:10 a.m., observed a Black man generally matching the description that Lien Chau provided enter the building. Police then contacted the apartment's manager, who told them only one person matched the description Lien Chau had given — Gregory Marino. Officers went to Marino's apartment and asked him to accompany them to the station for questioning, which Marino agreed to do.

Marino was cooperative and consented to the search of his apartment, the taking of his fingerprints, the sampling of his blood and urine, and the scraping of the area underneath his fingernails. During the interview, officers noticed Marino had what appeared to be a fresh cut on his finger and a bloodstain on his thumbnail. Officers collected a sample of the bloodstain and subsequent testing determined it was Marino's blood. Marino's co-worker later testified at trial that Marino had cut himself on a piece of glass at work earlier in the day.

The police searched Marino's apartment and the surrounding area (including the laundry room, storage lockers, several vacant apartment storage areas, nearby dumpsters, and the wooded area northeast of the apartment), as well as the Nguyen apartment and the surrounding area. They found no discarded clothing, no blood trail, no discarded weapons, no rubber boots, no hat with an "A" on it, nor anything else that would have connected Marino to the crime. The police took possession of the gray-hooded varsity jacket and the other clothing Marino was wearing that night.

---

[7] Captain initially testified that she thought Marino was wearing a blue jean jacket but she subsequently identified the gray-hooded black varsity jacket as the jacket she saw him wearing.

Approximately two and a half days after the attack, the police interviewed Lien Chau at the hospital. The police detective showed Lien Chau a picture of Marino's apartment building. Lien Chau stated that she recognized the building. When Lien Chau identified Marino's apartment door in the picture, the detective stated that she had identified "the defendant's door" and her mother and a nurse both clapped. Lien Chau was then shown a six-person photographic line-up and asked if she recognized any of the men as the man who hurt her. Lien Chau told the detective that the man depicted in photograph number 3 — *i.e.*, Marino — "looks like it might be him . . . cause he had hair like that one . . . I think that's him. Cause he had [a] lot [of] curly hair here." As we noted in Marino's direct appeal, Lien Chau's reference to "curly hair" in this context is "puzzling" because Marino's photograph "clearly shows him to be nearly bald."[8] Lien Chau also told the detective that her assailant was not wearing gloves.

Prior to trial, Marino's attorney filed a motion to suppress Lien Chau's photo identification of Marino and his apartment, arguing that it was tainted by the overly suggestive manner in which it was obtained. Marino's attorney argued that the identification was tainted because Lien Chau was shown Marino's apartment first and was applauded for picking the right one. The attorney also argued that Lien Chau had understood the detective to be asking her who lived in that apartment when he showed her the six-person photo line-up, rather than asking who assaulted her.[9] The superior court agreed that the identification was "unnecessarily suggestive" and "could have

---

[8]   *Id.* at 1328.

[9]   During cross-examination of Lien Chau at trial, Marino's attorney asked Lien Chau if the detective was trying to get her to tell him who lived in the apartment when he did the photo line-up, to which Lien Chau said, "Yeah." Marino's attorney then asked Lien Chau if that was what she was trying to do (*i.e.*, to tell the detective who it was that lived in the apartment), to which Lien Chau agreed.

been done more appropriately." After considering the factors set out in *Holden v. State*[10] and *Manson v. Brathwaite*,[11] however, the superior court found Lien Chau's identification of Marino "reliable based on the totality of the circumstances" and denied the motion to suppress.

During trial, in addition to the photo identification just discussed, the State asked Lien Chau during her testimony if the person who attacked her was in the courtroom. Lien Chau testified that he was, and she identified Marino.[12]

Lien Chau also testified during cross-examination that her mother and the prosecutor had told her that the man who hurt her would be in the courtroom and where he would be sitting. However, Lien Chau's mother testified that neither she nor the prosecutor told Lien Chau that the person who attacked her would be sitting at the defense table, but rather that she told Lien Chau the person who attacked her may be in the courtroom. Lien Chau's mother opined that Lien Chau testified as she did because of the leading nature of the defense attorney's questions and because she was frightened.

At trial, the State's case focused primarily on Lien Chau's eyewitness identification and the threats Marino made regarding the gold rings. This was because

---

[10] *Holden v. State*, 602 P.2d 452, 455-58 (Alaska 1979) (identifying five factors to analyze when determining the admissibility of identification testimony: (1) "the opportunity of the witness to view the criminal at the time of the crime"; (2) "the witness' degree of attention"; (3) "the accuracy of his prior description of the criminal"; (4) "the level of certainty demonstrated at the confrontation"; and (5) "the time between the crime and the confrontation" (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977))). We note that in 2016, the Alaska Supreme Court articulated a new test for determining the reliability of eyewitness identification. *See Young v. State*, 374 P.3d 395, 413-28 (Alaska 2016).

[11] *Manson*, 432 U.S. at 114-16.

[12] In closing, both the prosecutor and the defense attorney acknowledged that Marino was the only Black man in the courtroom when Lien Chau made her in-court identification.

there was no forensic evidence linking Marino to the crime scene. As we explained in Marino's direct appeal:

> During their investigation of the crime scene, the police took several blood samples. None of these matched Marino's blood. The police also obtained several shoe prints from the crime scene. None of the shoe prints could definitely be attributed to Marino. The police also obtained seven usable fingerprints from the crime scene, as well as an adult's hand print in Lien Chau's bedroom and another hand print on the handle of the vacuum cleaner. None of these prints matched Marino's.
>
> None of the items the police seized from Marino's apartment (various items of clothing, as well as a washcloth and a shoe-cleaning kit) had blood on them, with the exception of one jacket. DNA testing eliminated Donna Jackson and Lien Chau Nguyen as possible sources of the blood on the jacket.
>
> There was no other forensic connection between Marino and the crime scene. There was no match between Marino's hair and hair samples found at the crime scene, nor were any hairs from Donna Jackson or Lien Chau Nguyen found at Marino's apartment or on any of his clothing. The police also tested for carpet fibers, but again there was nothing linking Marino to the crime scene.[13]

At the time of Marino's trial, DNA testing was still in its relative infancy. There were three forensic laboratories that originally conducted DNA testing in this case: the Alaska State Crime Laboratory; Cellmark Diagnostics, a private laboratory in Maryland; and Roche Laboratories, a private laboratory in North Carolina.

The State Crime Lab performed DQ Alpha typing, an early form of DNA testing.[14] The State Crime Lab's tests excluded Marino from the swab of blood taken

---

[13]   *Marino*, 934 P.2d at 1326.

[14]   *See* National Institute of Justice, United States Department of Justice, *Crime Scene and DNA Basics for Forensic Analysts: DQ-Alpha*, https://nij.ojp.gov/nij-hosted-online-training-courses/crime-scene-and-dna-basics-forensic-analysts/history-and-types-forensic-dna-testing/polymerase-chain-reaction-pcr/dq-alpha (last visited August 14, 2025). As a

from the doorjamb of the bedroom Lien Chau was in (Tag No. 128941). However, because Marino and Lien Chau share common alleles, the DQ Alpha typing tests could not exclude Marino from the swabs of blood taken from the wall under the window the attacker left through (Tag No. 128978).[15] Marino likewise could not be excluded from the scrapings taken of the blood from the bottom exterior window sill of that same window (Tag No. 089888). The State Crime Lab also could not exclude Jackson or Lien Chau from blood found on Marino's varsity jacket (Tag No. 150959).

However, Cellmark, the private laboratory in Maryland, was able to exclude both Jackson and Lien Chau as sources of the blood found on Marino's varsity jacket (Tag No. 150959). And Roche Laboratories, using a slightly more advanced form of DNA testing, excluded Marino from the blood swab from the wall (Tag No. 128978) and the blood scrapings from the window sill (Tag No. 089888).[16]

_____

serologist from the State Crime Lab testified, this is a basic form of testing that can only exclude possible contributors — the results do not tell the analyst anything about the contributor(s) of the sample, only what alleles are present.

[15] An allele is "[o]ne of two or more versions of a genetic sequence at a particular region on a chromosome." National Cancer Institute, National Institutes of Health, *Definition of allele*, https://www.cancer.gov/publications/dictionaries/genetics-dictionary/def/allele (last visited August 14, 2025).

[16] The Roche Laboratories test results were not available until the close of trial. The parties agreed to introduce the results through the following stipulation:

> On June 6, 1994 the State sent blood stains to Roche Laboratories for further DNA testing. More stains were sent by the State on June 29, 1994. Through no fault of the State, the tests were not done immediately, and the results were not received by the State until August 4, 1994. According to Roche Laboratory's forensic science expert Richard Guerrieri, based upon the tests he performed, Gregory Marino has been eliminated as a possible source of the genetic material detected in two of the blood stains submitted. Those stains were from blood swabs (APD Tag No. 128978) and blood scrapings (APD Tag No. 089888) found in the area of the window in Lien Chau Nguyen's bedroom. Donna Jackson and Lien Chau Nguyen remain included as possible sources of the above described samples.

Thus, the end result of the original DNA testing was that Marino's DNA was not found on any of the blood evidence collected at the crime scene, and Lien Chau and Jackson were excluded as the source of the blood on Marino's varsity jacket, which was found in his apartment.

During closing argument, the prosecutor focused on Lien Chau's identification, emphasizing that Lien Chau had identified Marino's apartment near Tommy's in her initial 911 call. The prosecutor also argued that the gold rings constituted the motive for the attacks.

In contrast, the defense attorney emphasized the lack of forensic evidence tying Marino to the crime scene, and she argued that it would be impossible for someone to commit such a bloody attack and not leave any forensic evidence behind. The defense attorney also attacked Lien Chau's identification of Marino as unreliable, arguing that Lien Chau was highly traumatized and easily suggestible. The attorney noted that Lien Chau did not know Marino well and that she had only interacted with him briefly on one previous occasion.

The defense attorney also argued that the police had not conducted an adequate investigation into alternate suspects, noting that the Nguyen apartment had been burglarized a week before the murder and that Donna Jackson had been stabbed on the street by a Black man who was not Marino the day before her murder.[17] The defense attorney speculated that Jackson knew the person who murdered her because there was no sign of forced entry and her shirt had been taken off.

The trial lasted over five weeks. After deliberating for over a week, the jury convicted Marino of the first-degree murder of Donna Jackson and the attempted

---

[17] In the weeks before the attack, the Nguyen residence was burglarized at least two times. The day before the murder, Donna Jackson was assaulted by three unidentified males, one of whom was a short Black man. Jackson was stabbed in the back and received an injury to her face. When the police investigated this assault, Jackson appeared intoxicated, did not provide clear information, and was uncooperative.

murder of Lien Chau Nguyen.[18] For these convictions, the superior court sentenced Marino to a composite sentence of 198 years to serve with no eligibility for discretionary parole.

Marino appealed his convictions and sentence to this Court.[19] On appeal, this Court rejected Marino's argument that Lien Chau's eyewitness identification was tainted by what had occurred in the hospital room (that is, the applause from the nurse and Lien Chau's mother and the detective's confirmation to Lien Chau that she had picked out "the defendant's" apartment).[20] We acknowledged that these reactions "might potentially be problematic in other circumstances," but concluded that they were not significant in this case because Lien Chau *knew* Marino and had essentially identified Marino as her sister's friend who lived near Tommy's in the 911 call (that is, prior to any suggestive reactions at the hospital).[21] Although we reversed two unrelated drug convictions, we otherwise affirmed Marino's convictions for murder and attempted murder.[22] We also affirmed his 198-year sentence, noting the savagery of the attacks and quoting the superior court's finding that Marino was "the personification of evil" as the person who committed these brutal acts.[23]

Following his direct appeal, Marino filed a petition for hearing with the Alaska Supreme Court, which denied the petition on July 21, 1997.[24] Marino also

---

[18]  The jury also found Marino guilty of first-degree assault, although this charge merged with the attempted first-degree murder conviction. *Marino*, 934 P.2d at 1333.

[19]  *Id.* at 1323.

[20]  *Id.* at 1327-29.

[21]  *Id.* at 1328-29.

[22]  *Id.* at 1335.

[23]  *Id.* at 1333-35.

[24]  *Marino v. State*, Supreme Court File No. S-08095 (Order dated July 21, 1997).

pursued a federal habeas petition.[25] The United States District Court dismissed this petition, and the Ninth Circuit affirmed the dismissal.[26] Marino also unsuccessfully applied for executive clemency with three successive Alaskan governors. Marino has maintained his innocence throughout all of these proceedings.

*Marino's post-conviction relief application*

In 2009, the Alaska Innocence Project filed an application for post-conviction relief on Marino's behalf. The application, which was filed more than eleven years after Marino's direct appeal became final, was untimely.[27] In order to have his untimely application heard by the superior court, Marino was required to show that he had acted diligently and that his claims were based on newly discovered evidence that: (1) "was not known within [] 18 months after entry of the judgment of conviction"; (2) "is not cumulative to the evidence presented at trial"; (3) "is not impeachment evidence"; and (4) "establishes by clear and convincing evidence that [he] is innocent."[28]

Marino asserted in his application that he was innocent, and he sought access to evidence from the crime scene for DNA testing that he claimed could help prove his innocence. Specifically, Marino sought the release of the fingerprint tape lifts, knives, knife blades and handles, vacuum cleaner handle and motor, certain blood

---

[25]  *Marino v. Pugh*, 2000 WL 198062 (9th Cir. Feb. 18, 2000) (unpublished).

[26]  *Id.* at *1-2.

[27]  AS 12.72.020(a)(3)(A) provides that an application for post-conviction relief may not be brought more than "one year after the court's decision is final under the Alaska Rules of Appellate Procedure." That is, an application for post-conviction relief is timely if filed within one year of the conviction becoming final on direct appeal.

[28]  AS 12.72.020(b)(2).

scrapings and swabs, and hairs found on and near Donna Jackson.[29] Marino also sought the release of palmprints lifted from the crime scene for comparison through a palmprint database that did not exist at the time of Marino's trial.

The State and Marino later entered into a stipulation through which the State agreed to make the requested evidence available for testing pursuant to general discovery rules on the condition that Marino: (1) file an amended application setting forth his specific claims for relief and omitting any claims for post-conviction DNA testing other than as a request for discovery; and (2) identify the specific items of evidence that he sought to test.[30]

The superior court accepted the stipulation and Marino filed an amended application alleging four causes of action: (1) a request for relief under AS 12.72.010(4) based on newly discovered forensic evidence that he anticipated the additional testing would generate;[31] (2) a claim of actual innocence under the due process clause of the state constitution;[32] (3) a claim of actual innocence under the due process clause of the

---

[29] In Marino's initial application and two subsequent applications, he specifically identified "negroid hairs" found on and near Jackson for additional testing. Marino asserted that modern DNA technology, which was unavailable in 1994, could identify the source of the hairs. However, after reviewing the record, it does not appear that any testing of these hairs was done. The only mention of hairs beyond Marino's applications is in a November 2012 notice of testing filed by the State. There, the State mentioned that "'tissue-like' debris from a hair sample" was retained by the State Crime Lab. Notably, hairs were not one of the items tested by the State Crime Lab or Sorenson Forensics.

[30] Marino's post-conviction relief application predated the enactment of AS 12.73, Alaska's post-conviction DNA testing statutory scheme.

[31] AS 12.72.010(4) ("[T]hat there exists evidence of material facts, not previously presented and heard by the court, that requires vacation of the conviction or sentence in the interest of justice."). We note that this is the subsection under which *timely* post-conviction relief applications based on newly discovered evidence can be brought. *See* AS 12.72.020(a)(3). Because Marino's post-conviction relief application was *untimely*, he is also required to meet the requirements under AS 12.72.020(b)(2).

[32] *See* Alaska Const. art. I, § 7.

---

federal constitution;[33] and (4) a claim of actual innocence under AS 12.72.010(1), which authorizes relief from a conviction entered in violation of the state or federal constitution.[34]

Pursuant to the stipulation, the requested evidence was to be tested in two stages. First, the fingerprint and palmprint evidence would be tested by the State Crime Lab to see if new methods could raise additional usable prints, and to compare the evidence against modern databases. Second, if the parties did not agree the print analysis established Marino's innocence, the State Crime Lab would send the DNA evidence for testing at an accredited laboratory of its choosing.

In March 2010, Marino filed a list of fingerprint and palmprint evidence to be tested, and by November 2010, the State Crime Lab had received all of the listed evidence to begin testing. Between September 2011 and November 2012, the State Crime Lab provided seven latent print examination reports, none of which appeared to yield useful results. In a November 2012 status report, Marino indicated that some of the print analysis done pursuant to the stipulation was in conflict with the print analysis done at trial, and thus asserted that additional testing may be necessary.

To resolve this, Marino and the State agreed to provide evidence to Arcana Forensics for additional testing at Marino's expense. This additional testing with Arcana appears to have been a dead end, with the primary problem being the age of the items being tested. In a March 2014 status report, Marino acknowledged that "[t]his area of investigation [had] gone about as far as it can be taken." No further mention of additional print analysis appears in the record after this status report.[35]

_____

[33]  *See* U.S. Const. amends. V, XIV, § 1.

[34]  AS 12.72.010(1) (authorizing petition for post-conviction relief when the applicant claims "that the conviction or the sentence was in violation of the Constitution of the United States or the constitution or laws of this state").

[35]  We note that it is sometimes difficult to piece together from the record precisely what post-conviction relief testing occurred. We remind attorneys representing post-

In a 2011 report, the State Crime Lab was provided five "items" for DNA testing that consisted of the blades and handles of knives from the crime scene. Those five items yielded twelve samples that the State Crime Lab separately tested.[36] Marino was excluded as a possible source of DNA on all samples for which the State Crime Lab could generate a full or partial DNA profile. Donna Jackson was identified as the source of DNA on some of the knife blade and handle samples, while Lien Chau was identified as the source of DNA on the other samples.[37]

The State Crime Lab subsequently sent all five samples from the blades and handles of the knifes (as well as a reference sample of Marino's DNA) for further testing to Sorenson Forensics, a private forensic laboratory in Salt Lake City, Utah. Sorenson Forensics conducted Y-STR DNA testing, an advanced form of DNA testing that detects the presence of male DNA. Sorenson later issued a report stating that four of the samples were inconclusive regarding the presence of male DNA because the amount of DNA detected was "below the minimum interpretation threshold." The fifth sample, which was taken from a blade of one of the knives, was suitable for testing and did not contain any male DNA. Marino was therefore excluded as the source of the DNA on that knife. No further testing on the knives was conducted.

The State Crime Lab also conducted testing of one additional sample taken from the vacuum cleaner handle. (At trial, the State's medical examiner, Dr. Michael

conviction relief applicants seeking DNA testing that it is their responsibility to create a record of what was or was not tested, and why.

[36] The State Crime lab's report indicates in the "Items Analyzed" section that the five items from the knives yielded seven "stains" and five "samples." However, throughout the remainder of the report, the stains and samples are both referred to as "samples."

[37] There was one sample taken from a bent knife blade (Tag No. 89873 KD) that had a mixture of DNA. Because of the complexity of the genetic profile obtained from the mixture, the sample was only suitable for exclusions. Lien Chau and Marino were excluded as sources for the mixture. Donna Jackson could not be excluded from the mixture. There is nothing in the record to suggest that the mixture contained any male DNA.

Probst, testified that the blunt force trauma to Donna Jackson's head was consistent with a blow from the vacuum cleaner. The vacuum cleaner was found next to her body, broken, and covered with blood and hair.) Two different samples were extracted from the vacuum cleaner handle. One sample was taken adjacent to the power switch, and the State Crime Lab determined it to be suitable for genetic testing. Marino and Lien Chau were excluded from this sample, but Jackson could not be excluded. As for the second sample, the State Crime Lab determined there was insufficient genetic material for further testing.

The State Crime Lab also sent this sample to Sorenson Forensics for Y-STR testing. The results yielded a mixture of at least four contributors, at least one of which was male. However, because of the complexity of the mixture, "[n]o meaningful comparisons" could be made to Marino's known reference sample. In other words, Sorenson Forensics could not exclude or include Marino from the presumed male perpetrator DNA on the vacuum cleaner handle.

In 2014, Marino sent the data Sorenson extracted from the vacuum cleaner handle to Cybergenetics — a bioinformation company that created the TrueAllele Casework program to analyze DNA data.[38] For reasons that are not clear from the record, Cybergenetics took four years to complete its analysis. In June 2018, Cybergenetics released its report which excluded Marino as a possible source of the male DNA found on the vacuum cleaner handle.

In 2016, while awaiting the Cybergenetics results, the Alaska Innocence Project filed a second amended application for post-conviction relief on Marino's behalf. The second amended application restated the four causes of action in the original amended application, and added two additional claims. The first additional claim is not

---

[38] The TrueAllele Casework method does not analyze actual samples of DNA. According to Cybergenetics's report generated in this case, a computer analyzes data already extracted to objectively infer genotypes using statistical modeling for subsequent comparison to known reference samples.

at issue in this appeal.[39] The second additional claim alleged that Marino's trial attorney had provided ineffective assistance of counsel by failing to call an expert in eyewitness identification at trial.

In support of the ineffective assistance of counsel claim, Marino submitted affidavits from his trial attorney, Assistant Public Advocate Leslie Hiebert, and from Assistant Public Defender Craig Howard, who represented Marino in the pretrial proceedings prior to the Alaska Public Defender Agency withdrawing from Marino's case because of a conflict. In his affidavit, Howard attested that he had hired a national expert on eyewitness identification, Elizabeth Loftus, for Marino's trial, and he opined that no competent defense attorney would have proceeded to trial without an eyewitness identification expert in Marino's case. Hiebert attested that Loftus was unavailable for trial so she explored using a different expert, but ultimately decided against using that expert because the new expert's opinion seemed more "equivocal" than Loftus's. In a subsequent affidavit, Hiebert asserted that her failure to secure an eyewitness identification expert for Marino's trial constituted ineffective assistance of counsel.

In addition to the two attorney affidavits, Marino also submitted a report from an eyewitness identification expert, Mark Reinitz, a professor of psychology at the University of Puget Sound in Tacoma, Washington. In his report, Reinitz concluded that there were multiple reasons why Lien Chau's identification was unreliable, notwithstanding the fact that she had previously met Marino at least once.

---

[39] The first additional claim involved newly discovered witnesses that allegedly could identify the perpetrator. Marino asserted that he had identified two neighbors who had seen and heard the perpetrator on the night of the attacks. Marino sought to obtain a copy of the original photo line-up used with Lien Chau so that it could be used with these witnesses. Although it appears that Marino may have obtained a copy of the photo line-up from the Anchorage Police Department, there is nothing in the record to indicate whether it was shown to the witnesses or what their reactions were. On appeal, Marino's appellate attorney argues that the existence of these witnesses constitutes a "genuine issue of material fact" precluding summary disposition on Marino's claims. We disagree. Given the litigation that occurred in the superior court, it is clear that Marino's attorneys abandoned this claim.

First, he noted the cross-racial nature of the identification and the fact that Lien Chau was so young. According to Reinitz, studies show that "children under ten years old are much worse than adults at recognizing people," particularly "when the person being recognized is of a different race from the child." He therefore concluded that "the likelihood of [Lien Chau] correctly identifying an individual of a different race, who she did not know well, [was] low to begin with."

Second, Reinitz noted that the event was very violent and highly traumatic, and he asserted that "violence interferes with memory encoding." Third, Reinitz stated that "children are much more suggestible than adults," and he noted that Lien Chau was repeatedly exposed to improper feedback (including an overly suggestive line-up in which Marino's face was the only familiar one). Reinitz explained "that, all other things being equal, a witness will tend to choose the most familiar face from a photo montage" due to an effect known as "unconscious inference." Lastly, Reinitz noted that "children forget [things] much more rapidly than adults," particularly faces. Reinitz's ultimate conclusion was that all of the above issues created "a perfect storm for misidentification."

After additional litigation, the State moved to dismiss the second amended application for failure to state a *prima facie* case. The superior court denied the motion. The State also moved to dismiss the new ineffective assistance of counsel claim, arguing that it was untimely and that no exception for its untimeliness existed. The superior court denied this motion.

In January 2018, the superior court scheduled Marino's evidentiary hearing to begin that October.

In March 2018, Marino submitted his preliminary witness list for the October evidentiary hearing. The list included Marino himself; experts from the various labs to discuss the results of the DNA testing; Dr. Mark Reinitz; Craig Howard; Leslie Hiebert; and John Murtagh, a local defense attorney who had been hired as an expert on the ineffective assistance of counsel claim.

In June 2018, Cybergenetics released its report excluding Marino from the male DNA found on the vacuum cleaner handle. Marino later amended his final witness list to include a forensic analyst from Cybergenetics. Kristin Denning (a former State Crime Lab employee) was also included in Marino's amended final witness list.

*The State's motion for summary disposition and the superior court's order*

Shortly after Cybergenetics issued its report eliminating Marino as a possible contributor to the male DNA found on the vacuum cleaner handle, the State filed a motion for summary disposition. The State argued that there was no need for an evidentiary hearing because Marino had failed to raise any genuine issue of material fact related to his innocence. The State challenged the relevancy of the Cybergenetics results, arguing that there were outstanding questions about potential contamination, degradation, and how the samples had been collected. The State also renewed its prior objection that the ineffective assistance of counsel claim was untimely.

Marino filed an opposition, arguing that these outstanding questions could be addressed at the evidentiary hearing. Marino argued that the ineffective assistance of counsel claim was not untimely because he was raising a claim of actual innocence. Marino also argued that, even if the claim was untimely, the evidence supporting the claim — *i.e.*, the eyewitness expert's report — should be considered as part of his innocence claim.

The superior court held oral argument on the State's motion for summary disposition a little less than three weeks before the scheduled evidentiary hearing. At the outset of argument, the State noted that it had previously moved to include the record and transcripts from the trial in 1994, as well as the record on appeal, in the post-conviction relief application record. The superior court acknowledged that to be correct, but made clear that it had not looked at any of that evidence yet. The State argued that the Cybergenetics results excluding Marino from the male DNA found on the vacuum

handle did not constitute "newly discovered evidence" under the statute because it was merely cumulative of the lack of forensic evidence that had existed at the time of trial.

Five days before the evidentiary hearing was set to begin, the superior court issued a two-page order granting the State's motion and dismissing Marino's application. The superior court found:

> The apparent lack, at the time of testing of the vacuum, of Marino's DNA on the vacuum is insufficient to demonstrate his actual innocence by clear and convincing evidence. This is true whether the DNA test result is considered on its own or in combination with any other evidence.

The superior court further found that Marino's ineffective assistance of counsel claim was time-barred.

This appeal followed.

*Why we conclude that the superior court erred when it ruled that Marino had failed to raise any genuine issues of material fact with regard to his claim of innocence*

Post-conviction relief litigation is largely governed by Alaska Criminal Rule 35.1 and the Alaska Rules of Civil Procedure.[40] There are three stages of a post-conviction relief case: a pleading stage, a discovery stage, and an evidentiary hearing.[41] Many post-conviction relief cases are resolved before the evidentiary hearing, either by the State's motion for judgment on the pleadings under Alaska Criminal Rule 35.1(f)(1) or by the State's motion for summary disposition under Alaska Criminal

---

[40] Alaska Criminal Rule 35.1(g) states: "All rules and statutes applicable in civil proceedings, including pre-trial and discovery procedures [with the exception of Civil Rule 26(a)(1)-(4),] are available to the parties [in] post-conviction relief proceedings." *See also State v. Jones*, 759 P.2d 558, 565-66 (Alaska App.1988).

[41] *Jones*, 759 P.2d at 565-66; *see also* Alaska R. Crim. P. 35.1.

Rule 35.1(f)(3). Marino's case was dismissed at the second stage of proceedings in response to the State's motion for summary disposition.

A motion for summary disposition in a post-conviction relief case is analogous to a motion for summary judgment in a civil case.[42] As a general matter, a trial court may grant summary disposition on an application for post-conviction relief if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[43] "[T]he party seeking summary disposition has the burden of showing the absence of genuine issues."[44] "A judge has no authority to grant summary [disposition] based on the judge's pre-trial assessments of witness credibility or pre-trial assessments of the comparative strength of the parties' cases."[45]

Because Marino's case was dismissed at the second stage of proceedings (*i.e.*, because the superior court granted the State's motion for summary disposition), our review is *de novo*.[46] Because we are ruling as a matter of law, we owe no deference

---

[42] *Jones*, 759 P.2d at 566.

[43] *Lindeman v. State*, 244 P.3d 1151, 1154 (Alaska App. 2011) (quoting Alaska R. Crim. P. 35.1(f)(3)).

[44] *Donnelly v. State*, 516 P.2d 396, 399 (Alaska 1973).

[45] *Vizcarra-Medina v. State*, 195 P.3d 1095, 1099 (Alaska App. 2008); *see also Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520-21 (Alaska 2014) ("Alaska's summary judgment standard does not allow trial courts, on the limited evidence presented at the summary judgment stage, to make trial-like credibility determinations, conduct trial-like evidence weighing, or decide whether a non-moving party has proved its case. Although a trial court initially must determine whether the evidence could be believed by a reasonable person, that decision is not based on whether the court actually believes the evidence or whether it believes the moving party has better evidence.").

[46] *Lindeman*, 244 P.3d at 1154 (explaining that an appellate court reviews a summary disposition order *de novo*, viewing the evidence and all reasonable inferences in the record in the light most favorable to the non-moving party).

to the superior court's order and reasoning.[47] Instead, we must review the entire record and determine, using our independent judgment, whether there are genuine issues of material fact in dispute that require an evidentiary hearing to resolve.[48]

On appeal, the State argues that the superior court correctly dismissed Marino's case at summary disposition because Marino provided only "speculation" to support his claim of innocence. We disagree.

The primary piece of evidence that Marino relies on for his claim of innocence is the DNA testing of the vacuum cleaner handle. As already explained, DNA testing by Sorenson Laboratories identified a mixture of DNA on the vacuum cleaner handle, including the DNA of at least one male. Cybergenetics subsequently excluded Marino as the source of the male DNA on the vacuum cleaner handle.

The State argues that the exclusion is meaningless without additional information or explanation; the State asserts that because the vacuum cleaner handle could have been handled "by many different people," there is no non-speculative basis to infer that the male DNA found on the handle is perpetrator DNA. But the State's arguments ignore the significance of the fact that the DNA is *male*. The evidence at trial was that only women lived in the apartment in question. While undoubtedly there would have been male visitors to the apartment, there is little reason to conclude that those male visitors would have engaged in vacuum cleaning the apartment or would have otherwise handled the vacuum cleaner.

Moreover, the vacuum cleaner handle was identified at trial as a likely murder weapon. As we described the crime scene in Marino's direct appeal:

---

[47] *Nelson v. State*, 68 P.3d 402, 406 (Alaska App. 2003).

[48] *See Winschel v. Brown*, 171 P.3d 142, 145 (Alaska 2007) (citing *Olson v. Teck Cominco Alaska, Inc.*, 144 P.3d 459, 463 (Alaska 2006)) ("We independently review orders granting summary judgment by considering the entire record in the light most favorable to the non-moving party to determine whether it reveals any genuine issues of material fact.").

> The police . . . found an upright vacuum cleaner near Jackson's body. The vacuum cleaner was covered with blood, and the handle had been broken off from the base. The base of the vacuum was literally full of blood; it had to be drained and dried before the police could test it for fingerprints. . . . Subsequent medical examination revealed that there were approximately sixty-two knife wounds in Donna Jackson's body. Jackson had been stabbed in the heart, both lungs, the spleen, and the liver. Jackson had also sustained a serious head injury caused by a blunt object — most likely, the vacuum cleaner.[49]

Dr. Michael Probst, the medical examiner who examined Donna Jackson's body, directly testified that Jackson had sustained a serious head injury caused by a blunt object that could have been the vacuum cleaner. Given these circumstances, we conclude that Marino has raised a genuine issue of material fact as to whether the male DNA found on the vacuum cleaner handle is perpetrator DNA.

The State also argues that Marino "failed to offer any evidence establishing the specific location of the swab from the vacuum cleaner handle." This is incorrect. The record indicates that Kristin Denning from the State Crime Lab took the sample from the vacuum cleaner. Denning was added to Marino's witness list for the evidentiary hearing and could therefore be expected to testify regarding how and where she swabbed the vacuum cleaner handle.

The State argues that Marino failed to show the likelihood that the murderer touched the vacuum cleaner with "bare rather than gloved hands." But this argument overlooks that there was evidence at trial from Lien Chau that the perpetrator was not wearing gloves. It also overlooks the significance of the presence of male DNA on the apparent murder weapon in a household of only women.

The State also challenges the underlying foundation for the testing, asserting that Marino offered "no evidence" that the DNA had not been "degraded,

---

[49] *Marino v. State*, 934 P.2d 1321, 1324 (Alaska App. 1997).

destroyed, or mishandled over the years." But Marino's witness list included all of the forensic analysts who had handled and tested the vacuum cleaner samples, including those analysts where the tests had been inconclusive. These analysts are well positioned to address any chain of custody concerns that the State might have, how DNA can become degraded, and when (and to what extent) it is possible to get results from degraded DNA. The experts can also be expected to testify regarding the different methods of post-conviction DNA testing and the reliability of those methods in a case as old as Marino's.

We acknowledge that the Innocence Project could have done more to preview the anticipated testimony of the forensic experts at the evidentiary hearing. But in order to obtain summary disposition on Marino's claim, the State was required to show that there were no genuine issues of material fact and that the State was entitled to judgment as a matter of law.[50] The court was also required to draw all reasonable inferences in favor of Marino.[51] Here, Marino gave notice of DNA test results from accredited forensic laboratories, whose analysts could be expected to testify regarding their professional handling and testing of the evidence. While the State's concerns about chain of custody or possible degradation of the DNA are certainly legitimate, the existence of these concerns does not obviate the need for an evidentiary hearing; instead, it helps demonstrate one of the reasons for the evidentiary hearing.

Lastly, the State argues that summary disposition is appropriate because Marino's application is untimely and (in the State's estimation) Marino cannot meet the statutory exception for untimely applications — even viewing the facts in the light most

---

[50] *James v. Alaska Frontier Constructors, Inc.*, 468 P.3d 711, 717 (Alaska 2020) (citing *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014)).

[51] *Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 395 (Alaska 2013) (citing *Okpik v. City of Barrow*, 230 P.3d 672, 677 (Alaska 2010)).

favorable to Marino, as the post-conviction relief court is required to do at this stage of the proceedings.

As we discuss in more detail in the next section, in 1995 the Alaska Legislature enacted statutes of limitations for post-conviction relief claims. But at the same time, the legislature also enacted a statutory exception to the statute of limitations for defendants raising untimely claims based on newly discovered evidence of innocence. Alaska Statute 12.72.020(b)(2) states, in pertinent part, that notwithstanding the statutes of limitations provisions, "a court may hear a claim":

> (2) based on newly discovered evidence if the applicant establishes due diligence in presenting the claim and sets out facts supported by evidence that is admissible and
>
>> (A) was not known within
>>
>>> (i) 18 months after entry of the judgment of conviction if the claim relates to a conviction;
>>>
>>> . . . .
>>
>> (B) is not cumulative to the evidence presented at trial;
>>
>> (C) is not impeachment evidence; and
>>
>> (D) establishes by clear and convincing evidence that the applicant is innocent.[52]

In the current case, the State does not dispute that Marino has been diligent in pursuing the post-conviction DNA testing in his case. Indeed, the record shows that Marino filed his request for DNA testing in 2009, and the DNA tests excluding him as the source of the male DNA on the vacuum cleaner handle were not available until June 2018. (The record also shows that any delay since these DNA results were known is largely the result of litigation delays that are not attributable to Marino personally.)

---

[52]   AS 12.72.020(b)(2).

The State does dispute, however, that the newly discovered DNA test results are not cumulative to the evidence presented at trial. The State points out that there was no forensic evidence incriminating Marino at trial and it argues that "[m]erely learning that the State *still* does not have forensic evidence linking Marino to the crime scene does not change the balance of the evidence, let alone prove innocence."

But the law is clear that evidence that is "merely cumulative or impeaching" is evidence that is unlikely to lead to a different verdict "because it either is cumulative of the evidence previously available, or it simply reinforces the types of impeachment that were previously available."[53] "If, on the other hand, the newly discovered evidence undermines the government's case in a new and significant way, then the evidence is not 'merely impeaching' — and the trial judge must determine whether this evidence, if presented at a new trial, would probably lead to a different verdict."[54]

Here, a distinction must be made between the original DNA testing at trial and the post-conviction DNA testing. At trial, the defense was able to show that Marino was excluded from the various blood scrapings taken from: (1) the doorjamb of the bedroom Lien Chau was in; (2) the wall under the window that the attacker left through; and (3) the bottom exterior of the window sill of that same window. The defense was also able to show that Lien Chau and Donna Jackson were both excluded from the blood found on Marino's varsity jacket.

Following the post-conviction DNA testing, Marino could also show that he was excluded from samples taken from the blades and handles of the knives submitted for DNA testing. These exclusions have some probative value as they are further evidence that Marino (who had a cut on his hand) was not the source of the

---

[53] *Mooney v. State*, 167 P.3d 81, 91 (Alaska App. 2007).

[54] *Id.*

blood found at the crime scene. But these exclusions are only of marginal significance as non-cumulative newly discovered evidence because they only exclude Marino from what has now been identified, for the most part, as blood from the victims.

Of far greater probative value is the identification of male DNA on the vacuum cleaner handle and the exclusion of Marino from that alleged perpetrator DNA. Contrary to the State's claims, this newly discovered DNA evidence is not merely cumulative of the lack of forensic evidence that existed at trial. Instead, it represents new exculpatory evidence that, if proven true, undermines the State's case in a new way.

The remaining hurdle that Marino's untimely innocence claim faces is the final requirement under AS 12.72.020(b)(2)(D) — that the newly discovered evidence "establishes by clear and convincing evidence that [he] is innocent." In the next section, we discuss the history of this provision and the parties' competing interpretations of its meaning.

*Additional background on AS 12.72.020(b)(2)*

Prior to 1995, post-conviction relief litigation was conducted according to court rules that were adopted by the Alaska Supreme Court.[55] In 1995, the Alaska Legislature enacted AS 12.72, Alaska's statutory scheme for post-conviction relief.[56] The primary purpose of this legislation was to address the problems created by "frivolous or extremely tardy" prisoner litigation and to "promote the finality of convictions, preserve the sanctity of jury verdicts, minimize the litigation of stale

---

[55] *See, e.g.*, *Donnelly v. State*, 516 P.2d 396, 398-99 (Alaska 1973) (evaluating post-conviction application under Alaska Criminal Rule 35); *State v. Jones*, 759 P.2d 558, 565 (Alaska App. 1988) ("Applications for post-conviction relief are governed by Alaska Criminal Rule 35.1.").

[56] SLA 1995, ch. 79, § 9.

claims, and prevent the unjustified dismissal of a criminal case when reprosecution is not possible."[57] To this end, one of the changes made by the 1995 legislation was the enactment of statutes of limitations for post-conviction relief claims.[58] Under the new law, in order to bring a timely post-conviction relief application challenging a criminal conviction, a defendant had to file the application within two years of the entry of judgment in their case, or, if the conviction was appealed, within one year of when the decision on appeal was considered final under the appellate rules.[59] However, at the same time, the Alaska Legislature also enacted certain exceptions to the statutes of limitations. One such exception is a statutory exception for defendants raising otherwise untimely claims based on newly discovered evidence of innocence. This exception was codified in AS 12.72.020(b)(2), and as we previously noted, it states, in pertinent part, that notwithstanding the statutes of limitations provisions, "a court may hear a claim":

> (2) based on newly discovered evidence if the applicant establishes due diligence in presenting the claim and sets out facts supported by evidence that is admissible and
>
> > (A) was not known within
> >
> > > (i) 18 months after entry of the judgment of conviction if the claim relates to a conviction;
> > > . . . .
> >
> > (B) is not cumulative to the evidence presented at trial;
> >
> > (C) is not impeachment evidence; and

---

[57] Transmittal Letter from Governor Tony Knowles regarding H.B. 201 (Feb. 27, 1995) (contained in 1995 House Journal 488-89).

[58] SLA 1995, ch. 79, § 9 (enacting former AS 12.72.020(a)(3) (1995)).

[59] In 2008, the legislature shortened the deadline under AS 12.72.020(a)(3)(A) for filing a post-conviction relief application challenging the entry of judgment of a conviction from two years to eighteen months. SLA 2008, ch. 75, § 26.

(D) establishes by clear and convincing evidence that the applicant is innocent.[60]

Although AS 12.72.020(b)(2)(D) has been in place since 1995, neither this Court nor the Alaska Supreme Court has had occasion to interpret this subsection in a published opinion.[61] Because we have not previously construed this statutory language, we permitted the parties to submit supplemental briefing on this issue. We have now considered the supplemental briefing, which has been very helpful to the Court.

The proper interpretation and application of a statute is a question of law "to which we apply our independent judgment."[62] Our goal when interpreting a statute "is to give effect to the intent of the law-making body 'with due regard for the meaning that the language in the provision conveys to others.'"[63] To do that, "we look to the meaning of the language, the legislative history, and the purpose of the statute and adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[64] Under our "sliding scale" approach to statutory interpretation, "the plainer the statutory

---

[60] As originally enacted in 1995, AS 12.72.020(b)(2)(A)(i) required that the evidence was not known within two years after entry of the judgment of conviction. In 2008, consistent with the change noted in the previous footnote, the legislature reduced this period to eighteen months. SLA 2008, ch. 75, § 27.

[61] *See, e.g.*, *Clayton v. State*, 535 P.3d 909, 917 (Alaska App. 2023) (discussing the fact that although this subsection had been discussed in unpublished cases, it had never been construed in a published decision).

[62] *Adamson v. Municipality of Anchorage*, 333 P.3d 5, 11 (Alaska 2014) (citing *Grimm v. Wagoner*, 77 P.3d 423, 427 (Alaska 2003)).

[63] *State v. Galvin*, 491 P.3d 325, 336 (Alaska 2021) (quoting *Marlow v. Municipality of Anchorage*, 889 P.2d 599, 602 (Alaska 1995)).

[64] *Cath. Bishop of N. Alaska v. Does 1-6*, 141 P.3d 719, 722 (Alaska 2006) (quoting *Marshall v. First Nat'l Bank of Alaska*, 97 P.3d 830, 834 (Alaska 2004) (internal citations and quotations omitted)).

language is, the more convincing the evidence of contrary legislative purpose or intent must be."[65]

We begin by looking at the plain language of the statutory provision. The parties do not dispute that when the legislature enacted AS 12.72.020(b)(2), it did so against the backdrop of the *Salinas* standard, which has long been the standard governing motions for a new trial based on newly discovered evidence claims under Alaska Criminal Rule 33.

Criminal Rule 33 provides that a court may grant a new trial "if required in the interest of justice." In *Salinas v. State*, the Alaska Supreme Court held that a defendant moving for a new trial on the ground of newly discovered evidence is entitled to a new trial under Criminal Rule 33 in "the interest of justice" if the following requirements are met:

> (1) It must appear from the motion that the evidence relied on is, in fact, newly discovered, *i.e.*, discovered after the trial; (2) the motion must allege facts from which the court may infer diligence on the part of the movant; (3) the evidence relied on must not be merely cumulative or impeaching; (4) must be material to the issues involved; and (5) must be such as, on a new trial, would probably produce an acquittal.[66]

Both the Alaska Supreme Court and this Court have applied the *Salinas* test in the context of timely post-conviction relief claims based on newly discovered

---

[65] *Summerall v. State*, 553 P.3d 1255, 1259 (Alaska App. 2024) (quoting *Muller v. BP Expl. (Alaska) Inc.*, 923 P.2d 783, 788 (Alaska 1996)).

[66] *Salinas v. State*, 373 P.2d 512, 514 (Alaska 1962) (quoting *Pitts v. United States*, 263 F.2d 808, 810 (9th Cir. 1959)). As we have previously observed, almost every jurisdiction in the country uses a test essentially identical to the *Salinas* test in the new trial context. *Mooney v. State*, 167 P.3d 81, 91 (Alaska App. 2007); *Angasan v. State*, 314 P.3d 1219, 1222 (Alaska App. 2013); *see also* 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.11(d), at 737-52 (4th ed. 2024) ("All jurisdictions recognize what is often described as a delayed motion for new trial based upon newly discovered evidence.").

evidence — *i.e.*, claims that are filed within the statute of limitations and brought under AS 12.72.010(4) and Criminal Rule 35.1(a)(4).[67] These provisions provide that a defendant is entitled to post-conviction relief if "there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice."[68] In *Lewis v. State*, we noted that the same "interest of justice" language appears in Criminal Rule 33 (the rule governing motions for new trial) and Criminal Rule 35.1(a)(4) (the rule governing post-conviction relief actions), and we therefore concluded that the same *Salinas* test applied to both.[69] As we stated:

> An applicant for post-conviction relief who brings forth new evidence and seeks relief pursuant to Criminal Rule 35.1(a)(4) must meet the same burden as a defendant who files a timely motion under Criminal Rule 33 for a new trial based on newly discovered evidence. In either procedural setting, a new trial is warranted only upon a showing that the proposed new evidence is newly discovered and would probably produce an acquittal.[70]

---

[67] *Clayton v. State*, 535 P.3d 909, 917 (Alaska App. 2023); *see also James v. State*, 84 P.3d 404, 405-06 (Alaska 2004) (applying the *Salinas* test in the context of a timely post-conviction relief application raising a newly discovered evidence claim under Criminal Rule 35.1(a)(4)); *Lindeman v. State*, 244 P.3d 1151, 1156 (Alaska App. 2011) ("An applicant who seeks post-conviction relief based on newly discovered evidence must meet the same burden as a defendant who brings a motion for a new trial on the same ground."); *Mooney*, 167 P.3d at 83, 90-91 (applying the *Salinas* test to a timely request for post-conviction relief based on newly discovered evidence); *Tazruk v. State*, 67 P.3d 687, 689 n.2 (Alaska App. 2003) (explaining that "when a defendant seeks post-conviction relief based on newly discovered evidence, the defendant must meet the same test that governs motions for a new trial based on newly discovered evidence"); *Lewis v. State*, 901 P.2d 448, 450 (Alaska App. 1995) (explaining that "a new trial is warranted only upon a showing that the proposed new evidence is newly discovered and would probably produce an acquittal" under Criminal Rule 35.1(a)(4)).

[68] AS 12.72.010(4); *see also* Criminal Rule 35.1(a)(4).

[69] *Lewis*, 901 P.2d at 449-50.

[70] *Id.* at 450.

2814

Thus, it is settled law in Alaska that a defendant who files a timely application for post-conviction relief based on newly discovered evidence is entitled to reversal of their conviction and a new trial if they can prove, *inter alia*, that the newly discovered evidence would "probably produce an acquittal" when evaluated as part of the totality of the evidence that would be presented at a retrial.

What is unsettled is what a defendant who files an untimely application for post-conviction relief must prove to have their newly discovered evidence claim heard by the courts under AS 12.72.020(b)(2). The legislature's replacement of the last two elements of the *Salinas* test — *i.e.*, the requirements that the evidence be "material" and that it would "probably produce an acquittal" — with the statutory language, "establish by clear and convincing evidence that the applicant is innocent," suggests that the legislature intended something other than the *Salinas* "probably produce an acquittal" standard to apply.[71] The legislative history supports this inference.

At a March 18, 1995 committee meeting before the House State Affairs Committee, Deputy Attorney General Laurie Otto testified that a primary goal of the 1995 post-conviction relief legislation was to "put some finality in judgments of conviction in criminal cases" while still balancing "the rights of prisoners to have access to the courts in cases where there is, you know, truly legitimate need."[72] Otto asserted that the statute of limitations was intended to promote the State's interest in finality while providing "safety valves for extraordinary cases."[73] As she explained:

> If you come up with evidence that would, you know, if true
> show that you were innocent, for example, you could file a

---

[71] *See also State v. Finney*, 2001 WL 1448756, at *4 (Alaska App. Nov. 14, 2001) (unpublished) (suggesting that the standard under AS 12.72.020(b)(2) for untimely claims is "more stringent" than the "probably produce an acquittal" standard for timely claims).

[72] Audio of House State Affairs Committee, H.B. 201, testimony of Deputy Attorney General Laurie Otto, Tape 95-29, at 1:25 - 1:27 (Mar. 18, 1995).

[73] *Id.* at 1:26 (testimony of Deputy Attorney General Laurie Otto).

2814

motion for post-conviction relief. It's not absolute. But, if you want to get beyond and have a second appeal heard after this statute of limitations period, you have to make a much stronger showing than you would under normal cases.[74]

In later hearings, Otto reiterated that a defendant who had new evidence that would show they were innocent would be entitled to an exemption from the statute of limitations.[75]

> *Our resolution of the parties' competing interpretations of AS 12.72.020(b)(2)(D)*

Although the parties agree that the legislature intended for defendants raising untimely newly discovered evidence claims to make a "much stronger showing" than defendants raising timely newly discovered evidence claims, they disagree about what this "much stronger showing" entails.

Marino argues that the "much stronger showing" is met in two different ways. First, he asserts that the showing of diligence required under AS 12.72.020(b)(2) for untimely claims will necessarily be "much stronger" than the showing of diligence required for timely claims because the defendant will need to account for the additional delay that made the claims untimely. Second, he asserts that the requirement that the defendant's innocence be proven by clear and convincing evidence means that a

---

[74]  *Id.* (testimony of Deputy Attorney General Laurie Otto).

[75]  *See, e.g.*, Audio of House Judiciary Committee, H.B. 201, testimony of Deputy Attorney General Laurie Otto, Tape 95-36, at 32:00 – 35:00 (Mar. 27, 1995) (explaining that the proposed law was trying to prevent relitigating issues already decided by a jury, but if a defendant could "come up with new evidence that the jury didn't hear that would show by clear and convincing evidence that [they] were innocent, that would be grounds for escape from the time limits"); Audio of House Judiciary Committee, H.B. 201, testimony of Deputy Attorney General Laurie Otto, Tape 95-43, at 44:00 – 45:00 (Apr. 10, 1995) ("As we discussed extensively, if in fact somebody has evidence that would show that they were innocent that would be a ground[] for excepting it from the provisions of the bill.").

defendant raising an untimely newly discovered evidence claim bears a "much stronger" burden than a defendant raising a timely claim.

The Alaska Supreme Court has defined "clear and convincing evidence" as "evidence that is greater than a preponderance, but less than proof beyond a reasonable doubt."[76] As the supreme court has explained, "clear and convincing evidence means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved."[77] The supreme court has also described "clear and convincing evidence" as evidence establishing that something is "highly probable."[78] As Marino points out, proving that it is "highly probable" that a retrial would result in an acquittal requires a considerably stronger showing than proving that a retrial would "probably" produce an acquittal.

Thus, under Marino's proposed interpretation, a defendant filing an untimely post-conviction relief application raising a claim of innocence based on newly discovered evidence must prove that: (1) they have exercised due diligence in obtaining the newly discovered evidence; (2) the newly discovered evidence is not cumulative or merely impeaching; and (3) it is "highly probable" that the newly discovered evidence of innocence would produce an acquittal when evaluated with the totality of evidence.

The State challenges Marino's proposed standard on two different grounds. First, the State argues that Marino's standard does not result in a "much stronger" showing because, according to the State, a defendant raising a *timely* post-conviction relief application based on newly discovered evidence must already prove

---

[76] *R.A. v. State*, 550 P.3d 594, 604 (Alaska App. 2024) (quoting *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 187 (Alaska 2009)).

[77] *Buster v. Gale*, 866 P.2d 837, 844 (Alaska 1994) (quoting *Castellano v. Bitkower*, 346 N.W.2d 249, 253 (Neb. 1984)).

[78] *Adkins v. Collens*, 444 P.3d 187, 203 n.55 (Alaska 2019) (quoting *In re Reinstatement of Wiederholt*, 89 P.3d 771, 772 n.6 (Alaska 2004)).

the probability of an acquittal by clear and convincing evidence. Second, the State argues that it is not enough for a defendant to prove by clear and convincing evidence that the newly discovered evidence would result in an acquittal. Instead, the State argues that a defendant must affirmatively prove a negative — that they did not commit the crime. We address each argument in turn.

The State's first argument is derived from AS 12.72.040, a statutory provision that was also enacted in 1995. Alaska Statute 12.72.040 states that "[a] person applying for post-conviction relief must prove all factual assertions by clear and convincing evidence." The State argues that the "probably produce an acquittal" requirement for timely newly discovered evidence claims is a "factual assertion" that must also be proved by clear and convincing evidence. Thus, the State argues that a defendant filing a *timely* post-conviction relief application would have to prove that it was "highly probable" that the newly discovered evidence would "probably" produce an acquittal.

But such a standard is inconsistent with decades of case law. As already explained, there are numerous appellate cases — from both the Alaska Supreme Court and this Court — that make clear that the same *Salinas* standard applies to claims based on newly discovered evidence whether they are raised in a timely motion for a new trial under Alaska Criminal Rule 33 or in a timely post-conviction relief application under Alaska Criminal Rule 35.1(a)(4).[79]

---

[79] *See, e.g.*, *Lindeman v. State*, 244 P.3d 1151, 1156 (Alaska App. 2011) ("An applicant who seeks post-conviction relief based on newly discovered evidence must meet the same burden as a defendant who brings a motion for a new trial on the same ground."); *Mooney v. State*, 167 P.3d 81, 83, 90-91 (Alaska App. 2007) (applying the *Salinas* test to timely request for post-conviction relief based on newly discovered evidence); *James v. State*, 84 P.3d 404, 405-06 (Alaska 2004) (applying the *Salinas* test in the context of a timely post-conviction relief application raising a newly discovered evidence claim under Criminal Rule 35.1(a)(4)); *Tazruk v. State*, 67 P.3d 687, 689 n.2 (Alaska App. 2003) (explaining that "when a defendant seeks post-conviction relief based on newly discovered evidence, the defendant must meet the same test that governs motions for a new trial based on newly discovered evidence"); *Lewis v. State*, 901 P.2d 448, 450 (Alaska App. 1995)

The State's application of AS 12.72.040 to the "probably produce an acquittal" determination is also inconsistent with the canons of statutory construction. One such canon requires us to "presume that no words or provisions are superfluous and that the legislature intended 'every word, sentence, or provision of a statute to have some purpose, force, and effect.'"[80] If timely applications already require a defendant to prove the probability of an acquittal by clear and convincing evidence, then this would make meaningless and redundant the legislature's addition of "clear and convincing evidence" to the standard for *untimely* newly discovered evidence claims. In other words, if the likelihood of an acquittal were a factual assertion as the State argues, there would be no need to add the words "by clear and convincing evidence" to AS 12.72.020(b)(2)(D) because the defendant would already have had to prove his innocence by clear and convincing evidence under AS 12.72.040.

Ultimately, while it is clear from the plain language of AS 12.72.040 that the facts that *underpin* a newly discovered evidence post-conviction relief claim must be proved by clear and convincing evidence, we do not agree with the State that a trial court's ultimate determination of whether those facts would "probably produce an acquittal" is a "factual assertion" that would be subject to a clearly erroneous standard of review.[81] Indeed, the law is clear that such determinations are reviewed under an abuse of discretion standard of review rather than the clearly erroneous standard of

(explaining that "a new trial is warranted only upon a showing that the proposed new evidence is newly discovered and would probably produce an acquittal" under Criminal Rule 35.1(a)(4)).

[80] *State v. Fyfe*, 370 P.3d 1092, 1099 (Alaska 2016) (quoting *Adamson v. Municipality of Anchorage*, 333 P.3d 5, 16 (Alaska 2014)).

[81] *See Venning v. State*, 2004 WL 1336265, at *3 (Alaska App. June 16, 2004) (unpublished) (questioning whether "probably produce an acquittal" is a factual assertion subject to AS 12.72.040's clear and convincing evidence standard).

review reserved for factual findings by a court.[82] We accordingly reject the State's first argument against Marino's proposed standard.

The State's second argument against Marino's proposed standard involves the State's alternative proposed standard. The State's proposed standard focuses on the word "innocent" and what the legislature meant when it used that term in AS 12.72.020(b)(2)(D). The State argues that the legislature intended to distinguish between what the State calls "factual innocence" (or "actual innocence") and what the State calls "legal innocence."[83] The State defines "factual innocence" as involving the

---

[82] *Tucker v. State*, 892 P.2d 832, 834 (Alaska App. 1995) ("A trial court's denial of post-conviction relief is reviewed by this court to determine whether an abuse of discretion occurred." (citing *Brown v. State*, 803 P.2d 887, 888 (Alaska App. 1990), *abrogated on other grounds by David v. State*, 372 P.3d 265 (Alaska App. 2016))); *see also Love v. State*, 799 P.2d 1343, 1344 (Alaska App. 1990) ("The power to grant a new trial is entrusted to the discretion of the trial court, whose decision is subject to reversal only for an abuse of discretion.").

[83] In this decision, we use the terms "actual innocence," "factual innocence," and "legal innocence" as the State has defined them in its briefing. But we note that these terms are susceptible to other definitions and meanings in the relevant case law and academic literature. *See generally* Keith A. Findley, *Defining Innocence*, 74 Alb. L. Rev. 1157 (2011) (noting varying definitions of these terms).

For example, in much of the relevant federal case law, the term "legally innocent" is used to describe a defendant who committed the acts constituting the offense but who has a complete defense such as self-defense or entrapment. *See, e.g.*, *United States v. James*, 928 F.3d 247, 253-54 (3d Cir. 2019) (noting that "a claim of legal innocence [is] an adequate assertion of innocence" because "a defendant who has a complete affirmative defense, such as self-defense or entrapment, is not legally culpable"); *United States v. Berkeley*, 567 F.3d 703, 708 n.2 (D.C. Cir. 2009) (noting that "an entrapment defense may form the basis for a viable claim of innocence" (citing *United States v. Hanson*, 339 F.3d 983, 988 (D.C. Cir. 2003))); *United States v. Groll*, 992 F.2d 755, 759 n.5 (7th Cir. 1993) (noting that when a defendant raises an entrapment defense they can "admit to the conduct supporting the alleged offense" but "still claim [they are] legally innocent of the crime"); *Pacheco v. Habti*, 62 F.4th 1233, 1243 n.8 (10th Cir. 2023) (reviewing federal case law and concluding that "the circuits appear to agree that when an affirmative defense negates all guilt, it can support a claim of actual innocence"). It is clear from the State's briefing that the State considers defendants with complete legal defenses to be "factually innocent" for purposes of the innocence standard.

question of whether the defendant "in fact" committed the crime. In contrast, the State refers to "legal innocence" as involving the question of whether the State can prove the defendant's guilt beyond a reasonable doubt at a criminal trial. The State views these terms as distinguishable from one another, and argues that by using the word "innocent" in AS 12.72.020(b)(2)(D), the legislature was referring to "factual innocence" alone, untethered from the question of "legal innocence."

In other words, under the State's proposed standard, a defendant raising a *timely* newly discovered evidence claim of innocence can obtain post-conviction relief by proving that a retrial with the newly discovered evidence would probably result in an acquittal, but the *untimely* defendant must affirmatively prove that they did not commit the crime — an inquiry that the State views as entirely separate from the question of whether the State can prove their guilt. The State therefore rejects Marino's proposed standard through which a defendant asserting that they are actually innocent of the crimes for which they were convicted can prove that innocence by reference to their legal innocence — that is, by proving by clear and convincing evidence that they would be acquitted in light of the newly discovered evidence.

We have reviewed the plain language and legislative history of the statute, as well as case law relevant to the question at hand. This review supports the interpretation of AS 12.72.020(b)(2)(D) advanced by Marino.

Beginning with the plain language, the 1995 legislature did not provide a statutory definition of the word "innocent." Nor did it distinguish between "legal innocence" and "factual innocence" either in the statutory language or in the legislative history. Instead, the legislature used the generic term "innocent."

One canon of statutory construction provides that when we interpret a statute, we should "construe its language in accordance with its common usage, unless the word or phrase in question has acquired a peculiar meaning, by virtue of statutory

2814

definition or judicial construction."[84] Alaska Statute 01.10.040(a) likewise provides that words and phrases shall be construed according to common usage, unless they are defined by the legislature or have otherwise acquired a particular and technical meaning.[85]

The common usage of the word "innocent" generally interweaves the concept of factual or actual innocence with the concept of legal innocence, eschewing the binary dichotomy that the State relies on for its proposed standard. Thus, people speak about the "presumption of innocence" in relationship to both factual and legal innocence.[86] People also refer colloquially to criminal trials as determining the "guilt or innocence" of a defendant. Case law, including case law that predates the 1995 legislation, does the same.[87]

Dictionary definitions from both current dictionaries and dictionaries contemporaneous with the 1995 legislation also generally include some reference to

---

[84] *City of Valdez v. State*, 372 P.3d 240, 251 (Alaska 2016) (citation modified) (quoting *Municipality of Anchorage v. Suzuki*, 41 P.3d 147, 150 (Alaska 2002)).

[85] AS 01.10.040(a) ("Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage. Technical words and phrases and those that have acquired a peculiar and appropriate meaning, whether by legislative definition or otherwise, shall be construed according to the peculiar and appropriate meaning.").

[86] *See, e.g.*, "Presumption of innocence," Black's Law Dictionary (6th ed. 1990) ("A hallowed principle of criminal law to the effect that the government has the burden of proving every element of a crime beyond a reasonable doubt and that the defendant has no burden to prove his innocence.").

[87] *See, e.g.*, *Sheldon v. State*, 796 P.2d 831, 835-37 (Alaska App. 1990) (explaining that it is the grand jury's duty to ensure there is sufficient evidence for the case to be put in front of a trial jury for a determination of guilt or innocence); *Chief v. State*, 718 P.2d 475, 477 (Alaska App. 1986) ("The petit jury bears the ultimate decision of determining the defendant's guilt or innocence."); *Johnson v. Mississippi*, 486 U.S. 578, 585 (1988) (noting that once a "conviction has been reversed, unless and until [the defendant] should be retried, he must be presumed innocent of that charge").

legal guilt in their definitions of the term "innocent." For example, the 1994 Webster's New Universal Unabridged Dictionary defines "innocent" as, *inter alia*, "[F]ree from legal or specific wrong; guiltless: *He was innocent of the crime.*"[88] Likewise, the 1993 New Shorter Oxford English Dictionary defines "innocent" as, "Free from specific guilt; that has not committed the offence in question; not deserving the punishment etc. inflicted; not guilty."[89] And the 1990 version of Black's Law Dictionary defines "innocent" as, "Free from guilt; acting in good faith and without knowledge of incriminatory circumstances, or of defects or objections. *See* Not guilty."[90]

The United States Supreme Court's construction of the term "innocence" in 1995 supports viewing this term through the lens of the likelihood of acquittal. In *Schlup v. Delo*, a seminal innocence case, the Supreme Court stated that it is a "proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt."[91]

*Schlup* was issued a few months before AS 12.72.020(b)(2) was enacted, and the 1995 legislature may therefore not have been familiar with that case. But prominent in the nationwide debate at the time was an article on innocence by Judge Henry Friendly, which was written in 1970 and repeatedly cited in *Schlup* and other

---

[88] "Innocent," Webster's New Universal Unabridged Dictionary (1994); *see also* "Innocent," Webster's II New College Dictionary (1995) ("Not guilty of a given crime: legally blameless <found *innocent* on all counts>").

[89] "Innocent," New Shorter Oxford English Dictionary (1993); *see also* "Innocent," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/innocent (last visited August 14, 2025) ("[F]ree from legal guilt or fault.").

[90] "Innocent," Black's Law Dictionary (6th ed. 1990). We note that the current edition of Black's Law Dictionary includes definitions of "actual innocence" and "legal innocence" in its definition of "innocence," but those definitions primarily focus on the death penalty. *See* "Innocence," Black's Law Dictionary (12th ed. 2024).

[91] *Schlup v. Delo*, 513 U.S. 298, 328 (1995).

innocence cases before the Court.[92] In his article, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, Judge Friendly criticized the then-existing federal habeas corpus jurisprudence as promoting endless litigation of criminal cases and failing to protect the finality of criminal judgments — criticisms that would later be levied against Alaska's post-conviction relief process and lead to the enactment of the restrictions contained in AS 12.72.[93] Judge Friendly argued that the proper purpose of habeas litigation is to provide relief to defendants who are innocent but have been wrongly convicted.[94] He therefore proposed that the system be reformed to curb the existing excesses, but to facilitate relief in circumstances where a defendant has a "colorable claim of innocence."[95]

It is clear from context that when Judge Friendly was referring to an innocent defendant, he was referring to a defendant who had not committed the crime for which they have been convicted. And it is equally clear that Judge Friendly believed

---

[92]  *See* Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142 (1970); *Schlup*, 513 U.S. at 327-29 (adopting Judge Friendly's method for evaluating innocence claims); *see also Herrera v. Collins*, 506 U.S. 390, 438-39, 443 (1993) (Blackmun, J., dissenting) (noting that "Judge Friendly recognized that substantive claims of actual innocence should be cognizable on federal habeas"); *Kuhlmann v. Wilson*, 477 U.S. 436, 453-54, 454 n.17 (1986) (plurality opinion) (adopting Judge Friendly's standard for permitting innocence claims in successive habeas petitions), *superseded by statute on other grounds as recognized in Banister v. Davis*, 590 U.S. 504 (2020); *Sawyer v. Whitley*, 505 U.S. 333, 339 n.5 (1992) (discussing actual innocence standard previously adopted from Judge Friendly); *Bousley v. United States*, 523 U.S. 614, 623 (1998) (noting actual innocence standard adopted from Judge Friendly); *House v. Bell*, 547 U.S. 518, 537-38 (2006) (same).

[93]  Friendly, *supra* note 92, at 142-46 (discussing concerns about collateral attacks on criminal convictions based on stale, frivolous, and repetitious petitions).

[94]  *Id.* at 142-46, 160 (explaining that he "would also allow an exception to the concept of finality where a convicted defendant makes a colorable showing that an error . . . may be producing the continued punishment of an innocent man").

[95]  *Id.*

that a defendant's innocence should be assessed in reference to the strength of the State's criminal case against them. Thus, Judge Friendly proposed the following formulation for innocence-based habeas corpus claims:

> [T]he petitioner for collateral attack must show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt.[96]

Judge Friendly's proposal became the template for the innocence standard adopted by the United States Supreme Court in *Schlup*. Acknowledging "that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence," the *Schlup* Court held that a habeas petitioner claiming actual innocence would be entitled to relief from various procedural obstacles (including statutes of limitations) if the petitioner could show "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."[97] The Supreme Court explained that

---

96  *Id.* at 160.

97  *Schlup*, 513 U.S. at 327-28; *see also Bell*, 547 U.S. at 538 ("A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt — or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.").

The *Schlup* standard is considered a "gateway" innocence standard under federal law because, by meeting the *Schlup* innocence standard, the habeas petitioner obtains a "gateway" to litigate otherwise procedurally defaulted federal habeas constitutional claims. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). This type of "gateway" innocence claim is contrasted in federal law with what is referred to as a "freestanding" innocence claim, which is when a petitioner is making a substantive claim of innocence without asserting any underlying constitutional error from their trial. The distinction between a gateway innocence claim and a freestanding claim is important for the federal courts because in *Herrera v. Collins*, the United States Supreme Court indicated that it was an open question whether the federal constitution protected an innocent defendant absent an underlying claim of constitutional error. *Herrera*, 506 U.S. at 404-05, 416-19. That is, the

---

this standard is analogous to a preponderance of the evidence standard, but is higher than a "reasonable probability" standard and lower than the "clear and convincing evidence" standard.[98]

_Herrera_ Court held that the availability of a free-standing actual innocence claim in federal courts was unclear because "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution — not to correct errors of fact." _Id._ at 400; _see also Dist. Att'y's Off. for Third Jud. Dist. v. Osborne_, 557 U.S. 52, 71 (2009) (noting that whether there is a "federal constitutional right to be released upon proof of 'actual innocence' . . . is an open question"); _McQuiggin_, 569 U.S. at 392 ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.").

Notably, the distinction between "gateway" and "freestanding" claims is generally less relevant for state courts (who, unlike their federal habeas counterparts, engage in error correction, in addition to addressing constitutional violations). Many state courts have held that freestanding claims of innocence are cognizable in post-conviction proceedings. _See, e.g._, _People v. Ayala_, 219 N.E.3d 10, 48 (Ill. 2022) ("[A] freestanding claim of actual innocence is cognizable under the [Post-Conviction Hearing] Act."); _Schmidt v. State_, 909 N.W.2d 778, 795 (Iowa 2018) (holding that "the Iowa Constitution permits freestanding claims of actual innocence"); _Montoya v. Ulibarri_, 163 P.3d 476, 484 (N.M. 2007) ("To ensure that the principles of fairness within the New Mexico Constitution are protected, we hold that a habeas petitioner must be permitted to assert a claim of actual innocence in his habeas petition."); _State ex rel. Dorsey v. Vandergriff_, 685 S.W.3d 18, 24-25 (Mo. 2024) (recognizing freestanding claim of innocence); _Engesser v. Young_, 856 N.W.2d 471, 481, 481 n.3 (S.D. 2014) (recognizing freestanding claim of innocence and collecting cases and statutes from other jurisdictions that do as well).

Additionally, we perceive no reason to distinguish between gateway and freestanding innocence claims in the current case because the enactment of AS 12.72.020(b)(2) demonstrates the intent of the Alaska Legislature to ensure that the wrongful incarceration of an innocent person violates Alaska law even if the innocence claim is not timely. We note that, as a practical matter, AS 12.72.020(b)(2) can be used for both freestanding and gateway innocence claims and that Marino's application is clearly bringing both. That is, he is arguing that he is entitled to relief based on newly discovered evidence of innocence and he is also arguing that the newly discovered evidence of innocence means that he should be allowed to litigate his otherwise untimely ineffective assistance of counsel claim.

[98] _Schlup_, 513 U.S. at 327 (stating that the standard for gateway innocence claims "ensures that petitioner's case is truly 'extraordinary' while still providing petitioner a meaningful avenue by which to avoid a manifest injustice" (internal citation omitted)).

As the *Schlup* Court also explained, this standard is *not* the same as a legal sufficiency standard. Notably, the constitutional test for sufficiency under *Jackson v. Virginia* focuses on whether a reasonable trier of fact "could" find proof beyond a reasonable doubt — *i.e.*, whether it is possible for a reasonable trier of fact to convict on this quantum of evidence.[99] In other words, the sufficiency analysis "requires a binary response: Either the trier of fact has power as a matter of law or it does not."[100] Thus, an assessment of credibility is generally outside the scope of a reviewing court's sufficiency analysis.[101] Instead, in a sufficiency analysis, the reviewing court must view the evidence — and all reasonable inferences that can be drawn from that evidence — in the light most favorable to the conviction and then determine whether, viewing the evidence in that light, there is sufficient evidence from which a reasonable juror could find proof beyond a reasonable doubt to convict.[102]

In contrast, the *Schlup* innocence standard requires the habeas court at the evidentiary hearing stage to weigh the evidence and make the necessary credibility findings, and only then "to make a probabilistic determination" of what "reasonable, properly instructed jurors *would* do" when confronted with the totality of the evidence at a retrial.[103] As the *Schlup* Court noted, the word "reasonable" in this formulation has meaning: "It must be presumed that a reasonable juror would consider fairly all of the evidence presented . . . [and] would conscientiously obey the instructions of the trial

---

[99] *Id.* at 330-31 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)).

[100] *Id.* at 330.

[101] *Id.*

[102] *Johnson v. State*, 188 P.3d 700, 702 (Alaska App. 2008).

[103] *Schlup*, 513 U.S. at 329 (emphasis added); *cf. James v. State*, 84 P.3d 404, 406-08 (Alaska 2004) (remanding timely post-conviction application because the superior court failed to make the necessary finding of "whether the newly discovered evidence would probably produce an acquittal").

court requiring proof beyond a reasonable doubt."[104] The Supreme Court has made clear that this determination of innocence requires the court to consider *all* of the available evidence, including evidence (either exculpatory or inculpatory) that may have been available but was not used at the original trial.[105]

The majority of state jurisdictions that have considered this issue also view a defendant's post-conviction claim of actual innocence as something that is determined in relation to the State's burden of proof beyond a reasonable doubt in a criminal case.[106] For example, under Illinois law, a defendant raising an untimely post-

---

[104] *Schlup*, 513 U.S. at 329.

[105] *Id.* at 327-28 (noting that a reviewing court may "consider the probative force of relevant evidence that was either excluded or unavailable at trial" with due regard for any unreliability); *see also House v. Bell*, 547 U.S. 518, 538 (2006) ("[H]abeas court[s] must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" (quoting *Schlup*, 513 U.S. at 327-28)); *State ex rel. Robinson v. Vannoy*, 397 So. 3d 333, 369 (La. 2024) (noting that when a defendant claims innocence "all reliable evidence tending to establish the relevant facts should be considered" since the court's "paramount concern" is "the search for the truth" (quoting *State ex rel. Tassin v. Whitley*, 602 So. 2d 721, 724 (La. 1992))); *People v. Hamilton*, 979 N.Y.S.2d 97, 109 (N.Y. App. Div. 2014) ("At the [innocence] hearing, all reliable evidence, including evidence not admissible at the trial based upon a procedural bar . . . should be admitted."). We note that Marino's case does not involve consideration of any suppressed or otherwise inadmissible evidence, and we therefore do not address the question of whether such evidence can be used by the State to challenge a defendant's untimely newly discovered evidence claim.

[106] *See, e.g.*, Ariz. R. Crim. P. 32.1(h) (providing that a defendant is entitled to post-conviction relief upon demonstrating "by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would find the defendant guilty of the offense beyond a reasonable doubt"); *People v. Coleman*, 996 N.E.2d 617, 637 (Ill. 2013) (explaining that to succeed on a claim of actual innocence the petitioner must present evidence that, "when considered along with the trial evidence, would probably lead to a different result [on retrial]"); *Schmidt v. State*, 909 N.W.2d 778, 795-98 (Iowa 2018) ("For an applicant to succeed on a freestanding actual-innocence claim, the applicant must show by clear and convincing evidence that, despite the evidence of guilt supporting the conviction, no reasonable fact finder could convict the applicant of the crimes for which the sentencing court found the applicant guilty in light of all the evidence, including the newly discovered evidence."); La. Code Crim. Proc. Ann.

conviction claim of actual innocence is entitled to relief if they can prove that they would probably be acquitted on a retrial. As the Illinois Supreme Court explained in *People v. Coleman*:

> Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, non-cumulative evidence that is so conclusive it would probably change the result on retrial. . . . And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result.[107]

Likewise, in Delaware, the criminal rules allow a defendant to bring an untimely or successive post-conviction relief action if the defendant "pleads with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted."[108] The Delaware Supreme Court has construed this provision as requiring proof that the new evidence, "when considered in the context of all the relevant evidence by a properly instructed jury, it is such as will probably change the result if a

---

art. 926.2 (2021) (defining finding of "factual innocence" to require that new evidence establish that "no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict"); Va. Code Ann. § 19.2-327.13 (providing that a writ of actual innocence will lie upon, *inter alia*, "a finding that no rational trier of fact would have found proof of guilt . . . beyond a reasonable doubt"); *Beauclair v. State*, 419 P.3d 1180, 1189 (Kan. 2018) (explaining that under the revised statutory scheme "actual innocence requires the prisoner to show it is more likely than not that no reasonable juror would have convicted the prisoner in light of new evidence" (quoting Kan. Stat. Ann. § 60-1507 (West 2018))); *Riley v. State*, 819 N.W.2d 162, 170 (Minn. 2012) (construing actual innocence under the previous post-conviction statutory scheme to mean "evidence that renders it more likely than not that no reasonable jury would convict"). *But see Gould v. Comm'r of Corr.*, 22 A.3d 1196, 1206 (Conn. 2011) ("[A]ctual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime.").

[107] *Coleman*, 996 N.E.2d at 637 (first citing *People v. Washington*, 665 N.E.2d 1330, 1337 (Ill. 1996); and then citing *People v. Ortiz*, 919 N.E.2d 941, 951 (Ill. 2009)).

[108] Del. Super. Ct. Crim. R. 61(d)(2)(i).

new trial were granted."[109] In other words, a defendant proves their actual innocence in Delaware in relation to whether they would be found not guilty at a criminal trial.

In arguing against defining "innocent" under AS 12.72.020(b)(2)(D) in terms of whether a defendant would be acquitted at trial, the State points to a comment by a legislator in the legislative history. At a House Judiciary Committee hearing, Representative David Finkelstein emphasized the importance of exonerating innocent defendants and he expressed concern that AS 12.72.020(b)(2)'s requirements, including its requirement of proof by clear and convincing evidence, might be too onerous for those raising an untimely post-conviction relief application based on newly discovered evidence of innocence.[110] At the same time, he acknowledged that the standard "can't be just something that raises a reasonable doubt because obviously that could go on forever."[111] The State relies on this latter comment to argue that the legislature intended "innocent" under AS 12.72.020(b)(2)(D) to mean something other than proving a particular likelihood that the newly discovered evidence would result in an acquittal.

But proving that it is "highly probable" or even just "probable" that the newly discovered evidence would result in an acquittal requires more than just "raising a reasonable doubt."

In *Schlup*, the United States Supreme Court equated raising a reasonable doubt with the prejudice standard for other types of non-innocence post-conviction claims such as claims alleging *Brady* violations or ineffective assistance of counsel.[112]

---

[109] *Purnell v. State*, 254 A.3d 1053, 1100 (Del. 2021).

[110] Audio of House Judiciary Committee, H.B. 201, statement of Representative David Finkelstein, Tape 95-36, at 34:00 – 36:00 (Mar. 27, 1995).

[111] *Id.* at 35:00 – 36:00 (statement of Representative David Finkelstein).

[112] *Schlup v. Delo*, 513 U.S. 298, 314-15, 329 (1995); *see also id.* at 332-33 (O'Connor, J., concurring) (noting that the Court is adopting a higher standard than the prejudice standard, "which requires only 'a reasonable probability that, absent the errors, the

The Court has noted that, under federal law, a defendant is entitled to post-conviction relief on such claims if the defendant can prove that there is a "reasonable probability" that, but for the constitutional error, the outcome would be different.[113] A "reasonable probability" in this context is a lesser standard than the "more likely than not" standard used in *Schlup* (and *Salinas*), and only requires a showing of a probability "sufficient to undermine confidence in the outcome."[114]

In contrast, it is well established that proving that the newly discovered evidence would probably result in an acquittal (the *Salinas* standard used for timely newly discovered evidence post-conviction relief claims) is a difficult task that only the truly extraordinary cases can meet. As this Court has recognized, claims of newly discovered evidence are "viewed 'with great caution'"[115] and must meet the "stringent" *Salinas* standard.[116] Other courts have also emphasized the difficulty of proving that

---

factfinder would have had a reasonable doubt respecting guilt" (quoting *Strickland v. Washington*, 466 U.S. 668, 695 (1984))).

[113] *See Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."); *United States v. Bagley*, 473 U.S. 667, 681-82 (1985) (holding that undisclosed evidence in the *Brady* context "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").

[114] *Strickland*, 466 U.S. at 693-94. We note that the prejudice standard under Alaska law for such claims is even lower and requires the defendant to show only a "reasonable doubt" that the outcome would be different. *See State v. Jones*, 759 P.2d 558, 572 (Alaska App. 1988) (referring to the Alaska "reasonable doubt" standard as "significantly less demanding" than the federal "reasonable probability" standard).

[115] *Angasan v. State*, 314 P.3d 1219, 1222 (Alaska App. 2013) (quoting 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.11(d), at 562 (3d ed. 2007)).

[116] *Thompson v. State*, 1998 WL 720481, at *2 (Alaska App. Oct. 14, 1998) (unpublished).

newly discovered evidence would probably produce an acquittal.[117] The Delaware Supreme Court has referred to its innocence "probably change the result" standard as "a heavy burden" and has emphasized that "such meritorious claims are exceedingly rare."[118] Likewise, in *Coleman*, the Illinois Supreme Court pointed out how difficult the "probably change the result on retrial" standard is to meet, noting that there had been only three successful claims of innocence under this standard between 1996 (the date the standard was first articulated) and 2013 (the date *Coleman* was issued).[119]

Moreover, under Marino's proposal, he would only be entitled to post-conviction relief if he could prove that it was "highly probable" that the newly discovered evidence, when considered with the totality of evidence available, would produce an acquittal. As already explained, this standard is *higher* than the "probably produce an acquittal" *Salinas* standard used for timely post-conviction relief claims based on newly discovered evidence. Thus, under Marino's proposal, Alaska's innocence standard would already be higher than the standard used in many jurisdictions. Given the difficulty inherent in proving the *Salinas* standard, we believe that the State's concerns that Marino's proposed standard may be too low are misplaced.

We note that there is case law in Alaska — in particular, an Alaska Supreme Court case from 1993, *Shaw v. State, Department of Administration*[120] — that

---

[117] *See, e.g.*, *United States v. Saada*, 212 F.3d 210, 216 (3d Cir. 2000) (referring to the federal standard governing a motion for a new trial — which is materially identical to the *Salinas* standard — as a "heavy burden"); *State v. Gehm*, 600 N.W.2d 535, 540 (S.D. 1999) (referring to the state standard governing a motion for a new trial — which is materially identical to the *Salinas* standard — as a "heavy burden"); *see also* 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.11(d), at 740-41 (4th ed. 2024) (referring to the probably produce an acquittal standard as "rigorous").

[118] *Purnell v. State*, 254 A.3d 1053, 1100 (Del. 2021).

[119] *People v. Coleman*, 996 N.E.2d 617, 637 (Ill. 2013).

[120] *Shaw v. State, Dep't of Admin., Public Def. Agency* (*Shaw II*), 861 P.2d 566, 570 n.3 (Alaska 1993); *see also Foondle v. O'Brien*, 346 P.3d 970, 973-74 (Alaska 2015)

makes the binary distinction between a person's "actual innocence" and their "legal innocence" that the State argues should control the meaning of "innocent" under AS 12.72.020(b)(2)(D). However, *Shaw* is not a post-conviction relief case. It is a civil legal malpractice case.

Under Alaska law, a criminal defendant must first obtain post-conviction relief in the criminal justice system before they may sue their former defense attorney for malpractice in the civil system.[121] Thus, the appellant in *Shaw* had already had his convictions reversed through the post-conviction relief process before he sued his attorney for monetary damages in the civil lawsuit.[122]

In *Shaw,* the Alaska Supreme Court held that, as the plaintiff in the civil malpractice suit, the former criminal defendant bore the burden of proving that "he would have been found innocent at trial on the original charges."[123] The supreme court referred to this as a showing of "legal innocence" that the plaintiff was required to meet in order to establish a *prima facie* case for monetary damages.[124] The supreme court then held that the defendant in the civil malpractice case (*i.e.*, the defense attorney) could defend against the civil action by proving, as an affirmative defense, that the plaintiff (*i.e.*, the former criminal defendant) was "actual[ly] guilt[y]" of the underlying crime.[125]

---

(concluding that where "actual innocence is critical to [a] legal malpractice claim," "the public defenders' motion to dismiss properly raised the affirmative defense that [the criminal defendant] was actually guilty of misdemeanor DUI").

[121] *Shaw v. State, Dep't of Admin., Public Def. Agency* (*Shaw I*), 816 P.2d 1358, 1360 (Alaska 1991).

[122] *Shaw II*, 861 P.2d at 568-69.

[123] *Id.* at 573.

[124] *Id.*

[125] *Id.* at 573.

In a footnote, the supreme court distinguished between a criminal defendant's "'legal' guilt or innocence," which is determined by the criminal justice system, and the defendant's "'actual' guilt," which only becomes relevant in the civil legal malpractice context when a former criminal defendant whose convictions have been reversed seeks monetary damages through the civil system.[126] In making this distinction, the court emphasized the different purposes served by the two different systems, noting that "[i]t is indisputable that a primary goal, perhaps the paramount goal, of the criminal justice system is to protect the innocent accused against an erroneous conviction."[127]

In dissenting in part from *Shaw*, Justice Compton criticized the *Shaw* court for distinguishing between "actual" guilt and "legal" guilt, noting that "[u]ntil today people of the State of Alaska were considered innocent of crime unless and until found guilty beyond a reasonable doubt in a criminal proceeding."[128] Justice Compton also expressed concern that Alaska law already placed a heavy burden on a criminal defendant to obtain post-conviction relief as a prerequisite for bringing a civil malpractice suit against their former defense attorney, and that the standard created by the majority would essentially make it impossible for the former defendant to recover monetary damages.[129]

*Shaw* represents one of the few instances where Alaska case law has directly distinguished between a defendant's "actual innocence" and their "legal innocence" in the mutually exclusive manner that the State argues for here. But it is noteworthy that this distinction is only made in the context of a civil monetary damages

---

[126] *Id.* at 570 n.3.

[127] *Id.* at 570.

[128] *Id.* at 575-76 (Compton, J., dissenting).

[129] *Id.* at 577-78.

case *after* the defendant has already obtained post-conviction relief from their erroneous criminal convictions.[130] It is also noteworthy that, even in the civil law context, the Alaska Supreme Court put the burden of proving the former defendant's "actual guilt" on the former defense attorney, rather than placing the burden of proving their "actual innocence" on the former defendant. As the supreme court explained:

> Although we conclude that innocence or the actual guilt of the plaintiff is relevant [to the civil malpractice case], we decline to place the burden of proving actual innocence on the plaintiff. We have already burdened a criminal defendant bringing a malpractice action against his defense attorney by requiring the additional element of first obtaining post-conviction relief. Rather than require the plaintiff to prove his actual innocence in order to succeed, we hold that the defendant may raise the issue of the plaintiff's actual guilt as an affirmative defense.[131]

As already mentioned, the 1995 legislature did not distinguish between "actual innocence" and "legal innocence" when it drafted AS 12.72.020(b)(2)(D). Instead, it used the word "innocent." And unlike *Shaw*, the current case is not about

---

[130] We note that some jurisdictions require former criminal defendants whose convictions have been vacated to affirmatively prove their "actual innocence" separate from their "legal innocence" in order to obtain monetary compensation for their wrongful convictions. *See, e.g.*, 28 U.S.C. § 2513(a)(2) (providing that the claimant must prove they "did not commit any of the acts charged or [their] acts, deeds, or omissions in connection with such charge constituted no offense against [the Government], and [they] did not by misconduct or neglect cause or bring about [their] own prosecution"); Cal. Penal Code § 4903(a) (requiring that the claimant prove "the fact that the crime with which they were charged was either not committed at all, or, if committed, was not committed by the claimant"); Idaho Code § 6-3502(2) (requiring that a claimant establish "by a preponderance of the evidence" that they "did not commit the crime" or "the acts that were the basis of the conviction"); Kan. Stat. Ann. § 60-5004(c)(1) (requiring that a claimant establish "by a preponderance of the evidence" that "the claimant did not commit the crime or crimes for which the claimant was convicted"); Nev. Rev. Stat. Ann. § 41.900(2) (requiring that the claimant prove they "[d]id not commit the acts that were the basis of the conviction").

[131] *Shaw II*, 861 P.2d at 572.

monetary damages. Instead, it is about the validity of a criminal conviction and whether a person who has been imprisoned for a crime they claim they did not commit should have their convictions reversed and face a new trial rather than remain in prison.[132]

As the Alaska Supreme Court has repeatedly recognized, "a primary goal, perhaps the paramount goal, of the criminal justice system is to protect the innocent accused against an erroneous conviction."[133] With the advent of post-conviction DNA testing in the late 1980s, the specter of the innocent person wrongly convicted has loomed even larger in the public consciousness.[134] The 1995 legislative history demonstrates that the Alaska Legislature was aware that there could be innocent defendants wrongfully convicted and imprisoned in the Alaska criminal justice system, and that the legislature wanted to ensure that such individuals had access to post-conviction relief even if their claims were otherwise untimely. To this end, the legislature enacted AS 12.72.020(b)(2) as the threshold standard that defendants must meet to have their untimely claims of newly discovered evidence of innocence heard in the Alaska courts. Having examined the plain language of the statutory provision, the

---

[132] We note that, under Alaska law, the State is still entitled to retry a person even if they succeed in establishing their innocence under AS 12.72.020(b)(2)(D). This is in contrast to some other jurisdictions which vacate the conviction with prejudice. *See, e.g.*, D.C. Code § 22-4135(g)(3) ("If . . . the court concludes by clear and convincing evidence that the movant is actually innocent of the crime, the court shall vacate the conviction and dismiss the relevant count with prejudice.").

[133] *Young v. State*, 374 P.3d 395, 415-16 (Alaska 2016) (quoting *Shaw II*, 861 P.2d at 570).

[134] The first instance of DNA being used to determine innocence was the case of Gary Dotson, who was exonerated in 1989 after being incarcerated for a decade for a crime he did not commit. Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 63 (2008). Since Dotson's exoneration, there have been 375 exonerations based on DNA analysis as of 2020. Innocence Project, *DNA Exonerations in the United States (1989-2020)*, https://innocenceproject.org/dna-exonerations-in-the-united-states/ (last visited August 14, 2025).

legislative history, and the relevant case law, we conclude that the legislature intended this showing to be much stronger than the "probably produce an acquittal" standard used for timely newly discovered evidence claims but not so high that it becomes unmeetable.

We therefore hold that to obtain an exception from the statute of limitations that would otherwise apply, a criminal defendant raising an untimely claim of newly discovered evidence of innocence under AS 12.72.020(b)(2) must prove by clear and convincing evidence that the outcome would be an acquittal. In other words, the defendant must prove that it is "highly probable" that the newly discovered evidence would result in an acquittal when considered with the totality of evidence.

*Our resolution of this appeal*

Here, the critical evidence that was used to convict Marino was Lien Chau's eyewitness identification. But the fact that this eyewitness testimony, viewed in the light most favorable to upholding the verdict, is legally sufficient to support Marino's convictions does not answer the question of whether Marino will be able to establish his innocence by clear and convincing evidence in his post-conviction relief case. To answer that question, the superior court must hold an evidentiary hearing so that it can hear the testimony from Marino's witnesses, which include the DNA experts, the defense eyewitness identification expert, and Marino himself. The State should also be allowed to present any new evidence that it has that is relevant to Marino's guilt or innocence, even if that evidence was available but not presented at the original trial.[135]

---

[135] The State is also permitted to introduce evidence of guilt that has developed subsequent to the trial. *Cf. Osborne v. State*, 163 P.3d 973, 978-79 (Alaska App. 2007) (asserting that the State should be allowed to counter a post-conviction innocence claim with evidence of the defendant's confession to the Parole Board). As noted earlier, the federal courts and some state courts allow the State to rely on evidence that has been determined to be reliable although it may be inadmissible for procedural reasons. Because

The superior court should then evaluate and weigh the totality of the evidence for and against Marino and determine whether Marino has met his high burden of proving that it is "highly probable" that he would be acquitted in light of this evidence. We express no opinion as to whether Marino can meet this standard. We agree, however, that it was error for the superior court to dismiss his post-conviction relief case on summary disposition prior to the evidentiary hearing.

*Conclusion*

For the reasons explained here, the judgment of the superior court is REVERSED and this case is REMANDED to the superior court for further proceedings in accordance with the guidance provided in this opinion. We do not retain jurisdiction.

---

Marino's case does not involve this type of evidence, we do not decide that issue here. *See supra* note 105.